**UNITED STATES of America,**
**Appellee,**

v.

**Edward S. FRIEDLAND, Appellant,**
**No. 233, Docket 31474.**

United States Court of Appeals
Second Circuit.

Argued Jan. 3, 1968.

Decided March 11, 1968.

Terry F. Lenzner, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty., and Andrew M. Lawler, Jr., Asst. U. S. Atty., for Southern Dist. of New York, on the brief), for appellee.

H. Elliot Wales, New York City, for appellant.

Before LUMBARD, Chief Judge, and MOORE and FRIENDLY, Circuit Judges.

LUMBARD, Chief Judge:

Edward S. Friedland appeals from a judgment, entered after trial before Judge Tyler and a jury in the Southern District of New York, convicting him of receiving and transporting counterfeit securities in interstate commerce and conspiring to do so, in violation of 18 U.S.C. §§ 2314, 2315, 371 and 2. Appellant argues that proof of certain facts below was barred by collateral estoppel resulting from his prior acquittal on another charge in federal court in California. He also asserts error in the court's charge on intent, in the interruptions by government counsel during appellant's summation, and in the court's failure to provide a particular defense exhibit requested by the jury during its deliberations. We find no reversible error in the proceedings below and affirm the judgment of conviction.

The indictment—containing one conspiracy count and four substantive counts relating to the transportation of counterfeit bonds on May 15, 1965, from Newark, New Jersey, to New York and from New York to Paris—named appellant, co-defendants Dennis Lorraine, Richard Randall, George Mahler, Leo Sagal and Max Desatnick, and unindicted co-conspirator Thomas Roe. Only appellant went to trial. The government —chiefly through the testimony of co-defendants Lorraine, Randall and Desatnick—presented the following case.

In April 1965 defendant Lorraine, an English businessman in serious financial difficulty, came to the United States to obtain counterfeit securities for himself and his partner Thomas Roe. Shortly after his arrival, Lorraine was brought by defendant Randall to appellant's office in New York City and introduced to appellant, who is an attorney. After initial hesitation, appellant agreed to find a source of counterfeit securities for Lorraine.

In early May 1965, Randall and Lorraine returned to appellant's office, where appellant introduced Lorraine to defendant Mahler, saying that Mahler could supply counterfeit securities. Lorraine agreed to purchase from Mahler $100,000 worth of counterfeit International Telephone and Telegraph and Standard Oil of California bonds. After Mahler left, Lorraine gave appellant $2000 to purchase one genuine IT&T bond and one genuine Standard Oil bond, so that Lorraine could check the quality of the counterfeit bonds.

Within the next few days appellant obtained the genuine IT&T bond but had difficulty obtaining the Standard Oil bond. Lorraine said that he couldn't wait any longer and told appellant to contact Mahler and put through the order for the $50,000 worth of IT&T bonds.

When Lorraine returned to appellant's office on May 14, appellant informed him that the genuine Standard Oil bond had arrived, but Lorraine said that it was too late to change the plans. Since Lorraine was leaving the country that evening, he gave Randall the $12,500 purchase price for the bonds, telling Randall to have co-conspirator William Rose deliver the bonds to Lorraine or Roe in Paris. Appellant made arrangements for the delivery of the bonds in Newark, New Jersey, on the following day.

On May 15, appellant and Randall drove in appellant's car to the Robert Treat Hotel in Newark, where they met Mahler. After they gave him the money, Mahler left the hotel and obtained the bonds from defendants Desatnick and Sagal. Mahler placed the bonds in the trunk of appellant's car, having previously obtained appellant's keys for this purpose, and then returned to appellant and Randall.

After leaving the hotel, appellant and Randall drove to the East Side Airline Terminal in New York, where Randall purchased a ticket to Paris for Rose, and then to Randall's office. In appellant's presence, Randall gave the bonds to Rose and instructed him to deliver them to Lorraine in Paris. Appellant then drove Rose to the airline terminal.

Rose flew to Paris that evening and delivered the bonds to Lorraine and Roe. The bonds were pledged with a European bank and were later transferred back to the United States, where they were eventually discovered to be counterfeit.

Appellant, testifying in his own defense, admitted the meetings with Lorraine, Randall and Mahler in his office and the purchase of the genuine bonds for Lorraine. He also admitted being present at the Robert Treat Hotel with Randall and Mahler. However, appellant claimed that his dealings with Lorraine involved only the provision of legal advice concerning legitimate business activities and that, while he was aware that Lorraine and Randall were involved in an illegal transaction with Mahler, he took no part in this transaction and did not join in the conversations relating to it.

Appellant was found guilty on all five counts by the jury and was sentenced by Judge Tyler to concurrent terms of five years imprisonment on each count.

Appellant's first argument on appeal relates to the effect of his acquittal at a prior trial in the United States District Court for the Southern District of California on a charge of conspiring to buy and sell counterfeit currency. In the court below, appellant claimed that the prosecution of the present case subjected him to double jeopardy, since the offense charged was another aspect of the same alleged conspiracy involved in the California trial. On this ground, appellant moved before trial to dismiss the government's case and during the trial again moved for dismissal or a directed verdict of acquittal on the conspiracy count. The court below denied all these motions on the basis that the two charges were entirely different, requiring proof of different facts as well as being based on different law, and could not under any theory be construed as the same offense.

█ Offenses are not the same for purposes of the double jeopardy clause merely because they arise out of the same general course of criminal conduct; they are the "same" only when the evidence required to support a conviction upon one of the indictments would be sufficient to warrant a conviction upon the other. United States v. Kramer, 289 F.2d 909 (2d Cir. 1961).

The first count of the California indictment charged appellant, Lorraine, Randall, Roe and others with conspiring to possess and pass counterfeit currency; the alleged overt acts by appellant in furtherance of the conspiracy were various conversations with other conspirators on June 1 and July 2, 1965. Appellant was not named in the three substantive counts.

The present indictment charged, in the first count, that appellant and the other defendants had conspired to receive and transport counterfeit bonds in interstate commerce; the specified overt acts were that on May 15, 1965, Randall, Mahler, Desatnick and appellant each traveled from New York to Newark, New Jersey, in furtherance of the conspiracy. The four substantive counts charged all the defendants with offenses relating to the transportation of the bonds from Newark to New York and from New York to Paris on May 15.

Clearly, these two indictments do not charge the "same" offense, and the claim of double jeopardy was properly rejected by the trial court.

█ On this appeal, appellant no longer presses his claim of double jeopardy. Instead, he now argues that some of the factual issues in the present case were also involved in the California trial and that collateral estoppel bars the government from relitigating those issues which were determined in appellant's favor by his acquittal in the prior trial. Appellant did not raise this question in the court below. He made no objection on this basis to the introduction of any evidence; he never informed the trial judge as to any issues allegedly determined in the prior trial, nor did he ever request the court to read the record of the California trial. Appellant contends that the issue of collateral estoppel was in effect raised by the claim of double jeopardy; since the trial judge was aware that the effect of the prior trial was at issue, he should have considered whether there was any collateral estoppel resulting from the prior trial, even though this particular question was not raised. We disagree. While double jeopardy and collateral estoppel both relate to the effect of prior proceedings, they present distinctly different questions, and we do not think that a claim of double jeopardy is an adequate means of presenting to the trial court the issue of collateral estoppel. Since the question of collateral estoppel was never specifically presented to the trial court, the appellant is precluded from raising it now on appeal. See United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965),

cert. denied, 383 U.S. 907, 86 S.Ct. 887, 15 L.Ed.2d 663 (1966).

■■ Furthermore, appellant has not shown that any specific facts in the present record were concluded in his favor by the California acquittal. Collateral estoppel applies only to those matters which were determined by the prior verdict. See Sealfon v. United States, 332 U.S. 575, 578, 68 S.Ct. 237, 92 L.Ed. 180 (1948); Yates v. United States, 354 U.S. 298, 336–338, 77 S.Ct. 1064, 1 L.Ed.2d 1356 (1956); United States v. Kramer, 289 F.2d 909 (2d Cir. 1961). The party claiming the estoppel, in this case the appellant, has the burden of proof on this issue. United States v. Feinberg, 383 F.2d 60, 71 (2d Cir. 1967). Appellant did not present the transcript of the California trial to the court below; on the record before Judge Tyler, there was no basis for ascertaining what issues were determined by the acquittal in the prior trial.[1]

■ The appellant cannot shift to the trial judge the burden of establishing a record sufficient for this purpose. Appellant argues that the trial court, on its own initiative, should have read the record of the California trial. We do not think that the trial judge was required, without any such request by the defendant, to read the lengthy record of the prior trial. On the face of the California indictment, there was no indication that those proceedings involved any of the events at issue in the trial of the present case. If, as appellant asserts, the evidence at the California trial in fact included testimony concerning the meetings in appellant's office in April and May 1965 and other events involved in the trial of the present case, the burden was on appellant to present these portions of the California record to the court below.

■ Appellant also objects to a portion of the court's charge on intent which reads: "Unless and until outweighed by evidence to the contrary, the presumption is that every person knows what the law requires and what the law forbids." Since appellant took no exception to this language at the trial, he may not raise the issue, for the first time, on appeal unless the instruction constituted "plain error." United States v. Schabert, 362 F.2d 369, 373 (2d Cir.), cert. denied, 385 U.S. 919, 87 S.Ct. 230, 17 L.Ed.2d 143 (1966); United States v. Kahaner, 317 F.2d 459 (2d Cir.), cert. denied, 375 U.S. 836, 84 S.Ct. 74, 11 L.Ed.2d 65 (1963).

■ Appellant claims that it was plain error, arguing that the jury might have understood this sentence as charging a rebuttable presumption in favor of the government with regard to the essential element of intent to commit the crime. We reject the contention. It is clear from the language itself that the presumption relates only to the accused's knowledge of the law and not to his intent to commit the acts charged; any possible ambiguity was adequately clarified by the rest of the court's charge on the issue of intent, which clearly stated on several occasions that intent was an essential element which must be proved beyond a reasonable doubt. In this context, the jury must have understood that the government was not relieved of the burden of proving intent, and that the presumption merely meant that, in proving intent, the government was required to show only that the accused knowingly did the act and not that he knew the act to be against the law. We think that the charge in the present case was proper and could not have misled the jury.

■ Appellant further claims that he was prejudiced by government counsel's repeated objections during summation, specifying eighteen interruptions by the prosecutor on various grounds. While interruptions during summation are in general undesirable, there are situations where government counsel may properly object. In this case appellant, who had testified as a witness, conducted the

---

[1]. Appellant offered the California trial record for the first time at the oral argument of this appeal; we declined to consider it at that point in these proceedings.

summation on his own behalf.[2] On a number of occasions during his summation, appellant made significant departures from the record and started to supplement the testimony he had given on the witness stand; on these occasions, the government's objections were clearly warranted. The trial judge by his rulings and his comments to appellant and to government counsel, dealt with the interruptions in a manner well within his discretion. We find no error with reference to the summation.

Appellant's fourth argument is that the conviction should be reversed because the jury was denied its request to see a particular defense exhibit during its deliberations.

Shortly after commencing its deliberations, the jury returned to the courtroom for certain requested testimony and exhibits, including government exhibit 23 and defense exhibit F, which were certain pages in appellant's office diary. After the testimony was read, the jury was directly sent out to lunch. Immediately afterwards, government counsel pointed out that only part of the diary was in evidence; the court directed the clerk to cover the pages not in evidence, which the clerk then proceeded to do. From the record it is not entirely clear whether or not the diary had already been delivered to the jury room; however, the record does make clear that the jury had not yet retired and did not resume its deliberations or begin its examination of the exhibits until after the luncheon recess. When the jury resumed its deliberations after lunch, the jurors notified one of the marshals that the requested diary was missing. Before the diary could be delivered, the jury sent out word that they no longer required the diary.

The jury's request for the diary was not denied; the jury decided, before the diary could be delivered pursuant to the court's direction to the clerk, that it did not wish to examine the diary. There is no reason to believe that the delay resulting from the government's request that the portions not in evidence be segregated was for any improper purpose. Appellant claims that the diary, which shows that appellant was not in his office on May 5, 1965, contradicted the testimony of Randall and Lorraine that they met appellant in his office on that date and indicated that the alleged meeting could not have taken place. While appellant made this argument in his summation, it is not supported by the record. Neither Lorraine nor Randall definitely testified that May 5 was the date of the meeting; Lorraine stated that the meeting was on May 3 or 4, and Randall testified that it was on May 4 or 5. In any case, appellant in testifying admitted that a meeting had taken place in early May, although he denied having joined in the conversation at that meeting relating to the counterfeit bonds. It would have been impossible for the jury to have found on this evidence that the meeting never took place; the question for the jury was whether, at this meeting, appellant took any part in the discussion about the counterfeit bonds. On this record, it is impossible to see how the delay in delivering the diary to the jury could have prejudiced the appellant. It was, at most, harmless error.

The court expresses its appreciation to H. Elliot Wales, Esq., who undertook the assignment of representing Friedland on this appeal without benefit of compensation under the Criminal Justice Act, the district judge having found, when the question was referred to him by this court, that appellant did not qualify as being financially unable to retain counsel.

The judgment of the district court is affirmed.

---

2. Appellant was assisted at trial by counsel appointed under the Criminal Justice Act. However, appellant, who is an attorney, conducted much of the trial himself and delivered the summation for the defense.