**UNITED STATES of America**

**v.**

**Edward S. FRIEDLAND, Defendant.**

**No. 66 Cr. 392.**

United States District Court,
S. D. New York.

Aug. 4, 1970.

Whitney N. Seymour, Jr., U. S. Atty. for Southern District of New York, by Edward M. Shaw, Asst. U. S. Atty., for the United States.

Richard Owen, New York City, for petitioning defendant.

TYLER, District Judge.

Defendant has petitioned to set aside his conviction upon jury verdicts, alleging "taint" in the proceedings by illegal electronic surveillance and eavesdropping at the instance of the government. See Kolod v. United States, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968). Upon consideration of the hearing testimony and various documentary material, the petition is found to be lacking in merit and is denied for reasons to be discussed hereinafter.

### Procedural History

On April 26, 1966, this indictment was filed charging Edward S. Friedland,[1] a New York City lawyer, in five counts with receiving and transporting forged debenture certificates in interstate and foreign commerce and with conspiracy so to do, all in violation of Title 18, U.S.C. §§ 2314, 2315, 371 and 2. Trial commenced before the undersigned and a jury on March 29, 1967 and was completed on April 11, 1967 upon verdicts of guilty on each count. Thereafter, on May 18, 1967, this court sentenced Friedland to five years on each of the five counts, the sentences to run concurrently.

The judgment of conviction was affirmed on appeal. United States v. Friedland, 391 F.2d 378 (2d Cir. 1968). Shortly after affirmance, however, the appellate court granted Friedland's motion to remand the case to this court for a hearing pursuant to Kolod. Inexplicably, the copy of the order of remand did not reach this court until December 12, 1968. The record was returned to the

clerk's office of this court on December 24, 1968.

There then ensued further delay, apparently occasioned by two circumstances. First, the Department of Justice for some time was unable to locate the logs and other memoranda of "bugs" of conversations between Friedland and other persons.[2] Second, there are indications that representatives of the Department of Justice were endeavoring to obtain the cooperation of this defendant in respect to other criminal investigations. In any event, it was not until December, 1969 that this application finally surfaced to the direct attention of this court.

In January, 1970, the aforementioned logs and memoranda of the conversations were turned over by the order of this court and on consent of the United States to Friedland's counsel. Further delays were then encountered because of professional and personal commitments of Friedland's counsel. Finally, hearings were commenced on April 7 and continued thereafter on April 9, 17 and 21, and May 5, 6 and 21, 1970. On the latter date, the hearing was closed, subject to possible reopening for taking an affidavit and perhaps as well live testimony of Dennis Lorraine, a codefendant in this case who on May 21, 1970 was serving a sentence at the Federal Correctional Institute in Danbury, Connecticut. When defendant's counsel failed to timely produce a relevant affidavit of Lorraine as directed by this court, the hearing was deemed closed. Moreover, I note and specifically determine that any testimony or affidavit which Lorraine might have offered along lines suggested by Friedland's counsel would have been cumulative.

### The Two Areas of Inquiry

Because of the difficulties for the parties and the court inherent in this type

---

1. Also named as defendants were Max De-Satnick, Dennis H. Lorraine, George Mahler, Irwin H. Rubin and Leo Isaac Sagal. Their cases were disposed of in other proceedings.

2. As will be seen, the "bugs" affected and "listened to" premises of persons other than Friedland.

of proceeding, it may be useful to describe in some detail not only the two issues raised but also the evidence and other materials which were considered.

On March 10, 1970, Friedland's counsel filed a memorandum with the court indicating what he considered to be the thrust of this inquiry. This memorandum suggested that the sole issue turned upon various "bug" logs of the Federal Bureau of Investigation reflecting certain conversations in which Friedland was at least a partial participant. For shorthand purposes, this issue, the only one originally pressed by the defendant, will be referred to as the "electronic bug issue."

As the hearings unfolded, however, Friedland seized upon an argument which will be styled herein as the "surveillance activities" as alleged on the part of Irving Richards, a small-time criminal who, during the relevant period, was a client and criminal confederate of Friedland— and also an FBI informant. This second issue turned out to be the one to which the parties, most particularly the defendant, devoted most of their energies and arguments as the hearings wound to a conclusion. Indeed, the record suggests that the defense during the hearing virtually conceded that the originally submitted "electronic bug" issue is without merit.

### The "Electronic Bug Issue"

■ There were received into evidence two groups of FBI "logs" or memoranda of electronically overheard conversations which the government asked the court to assume for the purposes of these hearings to have been obtained illegally. The first group (see Exhibits A through P) are logs of "bugs" of the premises of one Arthur Tortorello. The remaining logs (see Exhibits Q through W) are those of "bugs" of the premises of a lawyer named Davis.[3] The Tortorello logs cover the period from January 8,

1962 through May 15, 1963; the Davis logs cover the period August 22, 1963 through September 5 of the same year. There can be no doubt that these "bugs" picked up conversations of Friedland in relation to such ignoble subjects as judge fixing, shylocking, fencing of stolen watches, trips by Friedland to Miami and Cleveland and at least an eliptical reference to a counterfeiting scheme, about which, according to Friedland's remarks to Tortorello, some unidentified person was "opening up on the stand".

■ These logs have nothing whatsoever to do with the subject matter of this case resulting in Friedland's conviction. The time periods are two to three years earlier than the events which were the subject of this case; moreover, the subject matter is entirely different and unrelated. For these reasons alone, I conclude that the government has sustained its position on the wiretap issue beyond a reasonable doubt. See Alderisio v. United States, 424 F.2d 20 (10th Cir. 1970).

■ But Friedland, with some dazzling detailed footwork which I fail to follow, offers the ultimate assertion that it must have been these illegal "bugs", particularly the one of Tortorello, which drew the attention of the FBI to him, Friedland, and that thus any post-bug investigation, indictment and conviction of him was tainted and void. Save perhaps for its audacity, this argument has little to commend it. As a legal matter, I can find no authority squarely holding that where an illegal surveillance does no more than draw the attention of law enforcement agencies to a given defendant, any subsequent conviction of that individual based upon otherwise untainted evidence must be voided. See reference in Schipani v. United States, 289 F.Supp. 43, at 61 (E.D.N.Y.1967). As a factual matter, I find that the surveillances or eavesdropping of Tortorello and Davis did not lead the squad of FBI

---

3. Friedland, of course, has standing to raise issues concerning these "bugs" to the extent his voice was overheard. See Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

Special Agent Edgar Best, which made this case against Friedland, to take an interest in the defendant.

At the hearing, Edgar Best testified at some length concerning the manner in which he and his men first became aware of Friedland and then developed an interest in him as a potential criminal defendant. Parenthetically, Best and his squad in New York City have and have had special concern for and jurisdiction of stolen and spurious securities investigations. Best (and his squad members) never knew of the bugs and the logs until informed of their existence in late 1969 or early 1970 by the Assistant United States Attorney handling this case. Moreover, I find that upon checking his squad's files as made available to me, there is no indication that any information contained in the Davis or Tortorello "logs" was disseminated to that squad; in fact, all indications are to the contrary.

The case against Friedland was "made" by Best and his men as hereinafter described. In January, 1965, Best and one of his associates paid a visit upon Irving Richards, then lodged in a New York City correctional facility. Richards was serving a ninety day sentence for perjury, apparently in connection with some testimony which he had been asked to give in connection with a state proceeding looking to the disbarment of Friedland. Best and his squad believed that Richards had information concerning certain securities frauds. Because Friedland's name as lawyer for many suspects in the area of the squad's work had come up too frequently to be mere coincidence, Best and his fellow agents had begun to suspect Friedland himself as one possibly involved in securities thefts and counterfeiting. Accordingly, when it became clear at this jail interview that Richards was piqued at Friedland for leaving him in the lurch, Best's conversation with Richards led to a tentative agreement by Richards to be cooperative about furnishing information respecting Friedland and others. Later in the spring of 1965, Richards was released

from a term at Rikers Island, but just before his release, he and Friedland had agreed to an arrangement whereby Richards would lease space in Friedland's law office.

Once ensconced in Friedland's suite, Richards lived a double life. He was a confidant of Friedland in certain illegal enterprises. He also served as a paid informant to the FBI. As the FBI reports indicate, during May, June and July, 1965, Richards furnished relevant information to the Bureau concerning Friedland in relation to this case. But, of some interest and significance, Richards did not appear as a witness at the trial, either for the government or the defense.

In view of these findings, the government has met its burden of establishing beyond a reasonable doubt that Edward S. Friedland was not convicted on the basis of the Tortorello and Davis "bugs". As indicated, the time span and subject matter of the Tortorello and Davis logs, even though they do pick up occasional conversations of Friedland, are totally separate and unrelated to the scheme which unfolded at the trial of this case. At best, then, Friedland has resorted to a desparate and ridiculous argument for complete immunity once he is overheard on an illegal wiretap or electronic surveillance even though the crimes for which he is convicted were committed long after the "bugs." Neither law nor common sense supports such a result.

 There remains for brief consideration a collateral issue raised by Friedland toward the end of the hearings stemming from the fairly recent decision of the Court of Appeals for the Tenth Circuit in *Alderisio, supra.* On the authority of that decision, the precise thrust of which I have considerable difficulty understanding, Friedland argues that this court should have required the government to produce the monitoring agents who conducted the "bugs" of Davis and Tortorello. Apparently, it is Friedland's theory that these agents were necessary witnesses in order to determine from them how and to whom the information

on the logs was disseminated. Whatever the rationale of the *Alderisio* holding, it seems clear that it has nothing to do with the facts of this case. Again, the compelling circumstances here are the subject matter and dates of the Tortorello and Davis taps. They have nothing to do with the facts upon which Friedland was convicted. Furthermore, believing Agent Best as I do, there is no issue of a serious nature that Best and his squad received the logs of or information from the Tortorello and Davis surveillances. Hence, I deem it to have been well within this court's discretion to deny the application of Friedland's counsel for production of the monitoring agents. United States v. McCarthy, 422 F.2d 160 (2d Cir. 1970).

*Surveillance Activities of Irving Richards*

Perhaps understandably, the defense belatedly but with fervor fashioned an issue as to alleged telephone monitoring by Irving Richards in Friedland's law office. Friedland, who seemed even less credible at the hearing than he did at his trial, if this is possible, testified that Richards surreptitiously picked up an extension telephone and listened to a conversation between Friedland and Dennis Lorraine, the adroit British confidence man who was a conspirator of Friedland in this case,[4] in relation to the spurious securities which were the subject of this trial. To corroborate his version, Friedland produced the affidavit of a New Jersey resident named Harry Gorman. Despite entreaties and invitations by both Friedland's counsel and government counsel, Gorman refused to appear as a witness. Perhaps in part because of Gorman's reluctance to affirm his story in person, Friedland then turned to one William Sauve, convicted not too long ago in this court for wire fraud, who appeared and gave evidence to bolster Friedland's testimony.

The government then produced Irving Richards, who testified at the hearing and flatly denied listening to any such conversation on Friedland's extension line. In my view, Richards has far the better of the credibility issue here. Sauve's demeanor during his testimony and his past history eloquently bared his motives for saying anything to help his former lawyer and friend.

The evidence at trial, and as well the evidence in the hearing, establish that Friedland took on Richards as his stooge and confidant in connection with the securities deals which were the subject of this case. In short, Friedland was keeping no great secrets from Irving Richards in the spring and summer of 1965; thus, his only serious complaint can be about his bad choice of confederates.

■ As if to illustrate this obvious point, Irving Richards testified that he did overhear a conversation of an incriminating nature between George Mahler and Friedland. Mahler was a codefendant in this case and, from the evidence, a longtime confidant and sometime law client of Friedland.[5] Friedland's pathetic efforts to make much of this do him no good. Of course Richards overheard the Mahler-Friedland conversation; he, Mahler and Friedland were members of the conspiracy charged in this case. True, as matters turned out, Friedland never should have trusted Richards or Mahler. Nevertheless, this does not amount to the kind of illegal taint which Friedland argues that it is. See Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966); United States v. DiLorenzo, 429 F.2d 216 (2d Cir. July 14, 1970).

*Conclusion*

It is determined that the government has sustained its burden beyond a reasonable doubt of establishing that the

---

4. Lorraine did not stand trial; instead, he cooperated with the prosecution and thereafter was the beneficiary of a nolle prosequi of the charges in this case against him.

5. Mahler, it appears, was also an FBI informant. He did not stand trial in this case.

conviction of Friedland was free from taint of illegal evidence, either by way of electronic surveillance or "bugging" or by surreptitious monitoring of defendant's office telephone.

Because of the unfortunate passage of time since the conviction of Friedland upon these serious charges, the United States Attorney is directed to arrange for the surrender of Friedland as quickly as possible. Upon his surrender, the judgment of conviction will be set aside, and Friedland will be resentenced and a new judgment of conviction entered so as to save his rights of appeal on the matters raised at this hearing. See Kolod v. United States, *supra*, 390 U.S. at 138, 88 S.Ct. 752, 19 L.Ed.2d 962.

It is so ordered.