**UNITED STATES of America,
Appellee,**

v.

**Edward S. FRIEDLAND, Defendant-Appellant.**

**No. 688, Docket 35527.**

United States Court of Appeals,
Second Circuit.

Argued March 29, 1971.

Decided April 21, 1971.

Edward M. Shaw, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for Southern District of New York, and Jack Kaplan, Asst. U. S. Atty., of counsel), for appellee.

Richard Owen, New York City (Owen & Turchin, Morton J. Turchin, New York City, of counsel), for defendant-appellant.

Before LUMBARD, Chief Judge, and FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

After affirmance of Friedland's conviction in March 1968, 391 F.2d 378, on a conspiracy count and four substantive counts relating to the interstate and foreign transportation of counterfeit bonds in violation of 18 U.S.C. §§ 371, 2314 and 2315, we granted a motion to remand for a hearing pursuant to Kolod v. United States, 390 U.S. 136, 88 S.Ct. 752, 19 L.Ed.2d 962 (1968), to determine whether the conviction was tainted by alleged violations of Friedland's Fourth Amendment rights. Due to circumstances that are highly regrettable but unnecessary to detail, the hearing was not held until the spring of 1970. Finding Friedland's contentions to be without merit, 316 F.Supp. 459 (1970), Judge Tyler, having set aside the judgment of conviction, entered a new one from which Friedland appeals. Two different types of alleged violations are presented.

I.

The FBI unlawfully installed electronic "bugs" in the Manhattan offices of one Arthur Tortorello from January 8, 1962 through May 14, 1963, and of a lawyer named Wilfred Davis from August 21 through September 4, 1963.[1]

---

1. The precise objectives of these bugs do not appear from the record. As explained by the principal witness at the hearing, Special Agent Best, the logs were the

The logs indicate that Friedland, also a lawyer, participated in some conversations at these offices and was on the other end of the line in a number of others. The logs reveal nothing in any way pertinent to the counterfeit bond scheme of April-May 1965, of which Friedland has here been convicted, although, as Judge Tyler said, 316 F.Supp. at 461, the bugs "picked up conversations of Friedland in relation to such ignoble subjects as judge fixing, shylocking, fencing of stolen watches, trips by Friedland to Miami and Cleveland and at least an elliptical reference to a counterfeiting scheme, about which, according to Friedland's remarks to Tortorello, some unidentified person was 'opening up on the stand.' "

In late 1963 or early 1964 Special Agent Best of the FBI was assigned to a squad investigating transactions in forged, counterfeit and stolen securities. He testified that he had never heard of any bugging involving Friedland until after the latter's conviction; that checking of the relevant FBI files showed that his squad had never received any memoranda containing information from the "bugs"; and that he never acquired information from any source concerning the activities of Friedland that were the subject of the bugged conversations—or at least any that he used.[2] His squad's interest in Friedland was triggered by cases where it was investigating another individual and "Mr. Friedland's name would come up either as being around a source of spurious securities or one that individuals had gone in or had gone into his office or something." In early 1965 Irving Richards, whose activities were then under investigation by Best's squad, was serving a sentence on a state perjury charge relating to testimony he had given, at Friedland's request, at the latter's disbarment proceeding. On the day Richards commenced serving his sentence, Best, accompanied by another agent, paid a visit to him, apparently with the dual purpose of pursuing their investigation of Richards and of developing an informant with respect to Friedland's activities. Richards offered to provide information on Friedland when released. He did, in a manner discussed in part II of this opinion. The district judge credited Best's testimony.

If this were all, we could readily affirm the court's ruling that the Government had proved by a preponderance of the evidence, United States v. Schipani, 289 F.Supp. 43, 63–64 (E.D.N.Y.1968), aff'd, 414 F.2d 1262 (2 Cir. 1969), cert. denied, 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970), that its focusing on Friedland's possible involvement with counterfeit bonds did not result from the illegal eavesdropping. Friedland's counsel asserts, however, that his efforts to show that this may not have been all were improperly restricted. On several occasions, both by written and oral demand, he sought to examine the bugging

responsibility of the FBI "intelligence" units; if some information requiring further investigative action came to the attention of the intelligence unit through the logs, an agent would prepare an "action" memorandum and channel it to the appropriate investigative or "substantive" unit. Hence, in ordinary course, a member of a substantive squad apparently would be unaware of the existence or purpose of a particular eavesdrop unless and until his squad received an action memorandum. Both of the two FBI agents who testified at the hearing were associated with substantive squads, and both testified they were unaware of the logs at issue until shortly prior to the hearing. See discussion in the text, *infra*. The two in-

dictments naming Tortorello, which defendant has included in his exhibits on appeal, suggest that Tortorello may have been the focus of an investigation principally with respect to securities fraud.

2. Despite the passing reference made by Agent Best to his squad's interest in Friedland concerning "stock manipulation"—which appellant attempts to link up with Tortorello's similar involvement, see fn. 1 *supra*—this statement was clarified soon thereafter as a reference to "transactions in stolen spurious securities," not SEC-type violations such as were the subject of the Tortorello indictments.

agents and/or their supervisor both to determine the completeness of the logs and, more pertinently, to determine whether the revelation of Friedland's unsavory activities might not have reached Best's squad, e. g., by oral reports from a bugging agent to a member of the squad or via such reports by the bugging agents or their supervisor to FBI headquarters and relayed by it to some member of Best's squad. Some support for this is given by testimony of Richards that at one time Best or the other FBI agent who accompanied him to the state prison mentioned Tortorello as a "connection" of Friedland's. Reading United States v. Schipani, *supra*, 289 F.Supp. at 62–63, to mean that Friedland's conviction would be tainted if there were any causal relationship between the bugging agents' discovery that Friedland was something other than a respectable member of the bar and the investigation of him launched many months thereafter,[3] the defense claims that it was entitled to explore the dissemination issue more fully and that the judge erred in foreclosing it from the challenge to Best's testimony which such exploration might have made possible.

The judge denied the requests of the defense to go further on the basis that, in light of his belief in Best, such action was "well within this court's discretion," 316 F.Supp. at 463, citing United States v. McCarthy, 422 F.2d 160 (2 Cir.), petition for cert. dismissed pursuant to Supreme Court Rule 60, 398 U.S. 946, 90 S.Ct. 1864, 26 L.Ed.2d 286 (1970). However, in *McCarthy* there was "no showing of any pertinent additional information that could have been produced by calling all the monitors who prepared the

logs," 422 F.2d at 164; and in United States v. Granello, 403 F.2d 337, 339 (2 Cir. 1968), cert. denied, 393 U.S. 1095, 89 S.Ct. 878, 21 L.Ed.2d 785 (1969), cited by *McCarthy*, the sole basis for the request was the possibility, unsupported by anything in the logs, that these may have been incomplete, and we upheld the denial of the request on the ground that "Granello did not raise a sufficient question concerning the incompleteness of the logs to require that the agents be called." The controlling case is Alderman v. United States, 394 U.S. 165, 180–187, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969), where, after discussing the requirements of disclosure of surveillance records, the Court stated, 394 U.S. at 185, 89 S.Ct. at 973:

> None of this means that any defendant will have an unlimited license to rummage in the files of the Department of Justice. Armed with the specified records of overheard conversations and with the right to cross-examine the appropriate officials in regard to the connection between those records and the case made against him, a defendant may need or be entitled to nothing else. Whether this is the case or not must be left to the informed discretion, good sense, and fairness of the trial judge.

This leaves unclear who are "the appropriate officials" whom the defendant must be permitted to cross-examine. No substantial further illumination on this point was furnished by Taglianetti v. United States, 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 302 (1969). There the Court affirmed the denial of a request to examine additional surveillance records which the district court had examined *in camera* and had declined to turn

---

3. Although, as Agent Best testified, Friedland was someone in whom the squad was interested when Best joined it, it was not until May of 1965, when Richards completed his term and began cooperating with the FBI with respect to Friedland, that the latter actually became the subject of a "case" investigation for which Best was the "case agent." As Best stated, "[t]his [his squad] is not an intelligence squad." See fn. 1 *supra*. "Cases

on a squad of this nature are only open [*sic*] when there is some kind of allegation * * * that would fit the basic statute as being a violation. In other words, you don't run intelligence cases on names or subject matter, but only on specifics." Hence, the concerted efforts to investigate Friedland's activities commenced over 1½ years after the last tainted log.

over on the ground that the defendant lacked standing to compel the disclosure. The Court rejected petitioner's argument that disclosure was nevertheless required since "neither the Government nor the District Court was able to determine with a certainty which conversations petitioner had been a party to," and stated that "[n]othing in *Alderman* * * * requires an adversary proceeding and full disclosure for resolution of every issue raised by an electronic surveillance." In United States v. Alderisio, 424 F.2d 20, 24 (10 Cir. 1970), an appeal from the judgment following the hearing on remand in *Alderman,* where, with respect to the Chicago-based aspect of the Alderisio investigation only the investigating agent had testified, the court of appeals directed production of the supervisor of the Chicago-based agent to testify whether any additional overhearings appeared in his records of the Alderisio investigation, "[b]ecause the extent of dissemination is so critical to a possible fourth amendment claim." However, the case for requiring such production in *Alderisio* was considerably stronger than here. Compare Nolan v. United States, 423 F.2d 1031, 1045 (10 Cir. 1969), cert. denied, 400 U.S. 848, 91 S.Ct. 47, 27 L.Ed.2d 85 (1970).

■ We find it unnecessary to decide whether the district court improperly limited the defense, since we do not accept the premise that if Best's squad was put on notice, through receipt of information obtained from illegal bugging, that Friedland was the sort of person who would bear watching, this alone would immunize him from investigation of different criminal activities and from prosecution on the basis of facts about them learned in a lawful way. Judge Learned Hand wrote for this court, on the third appeal in United States v. Nardone, 127 F.2d 521, 523 (2 Cir.), cert. denied, 316 U.S. 698, 62 S.Ct. 1296, 86 L.Ed. 1767 (1942), involving wiretaps rendered unlawful by § 605 of the Federal Communications Act:

The question therefore comes down to this: whether a prosecution must show, not only that it has not used any information illicitly obtained, either as evidence, or as the means of procuring evidence; but that the information has not itself spurred the authorities to press an investigation which they might otherwise have dropped. We do not believe that the Supreme Court meant to involve the prosecution of crime in such a tenebrous and uncertain inquiry, or to make such a fetich of the statute as so extreme an application of it would demand.

■ We see no basis for thinking that, as suggested, in the district court's opinion in United States v. Schipani, 289 F.Supp. at 63, the *Nardone* decision has been "undermined" by any decision of the Supreme Court or of this court. Such novelty as there was in Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), lay in its holding, *id.,* at 485, 83 S.Ct. at 416, that "verbal evidence which derives so immediately from an unlawful entry and an unauthorized arrest as the officers' action in the present case is no less the 'fruit' of official illegality than the more common tangible fruits of the unwarranted intrusion"—a point not at issue in *Nardone* or here, where the illegality was the hearing of the words themselves. Another portion of the *Wong Sun* opinion, dealing with physical evidence obtained from another defendant as a consequence of the verbal evidence, which was referred to by the district court in *Schipani,* 371 U.S. at 487–488, 83 S.Ct. at 417, read:

We need not hold that all evidence is "fruit of the poisonous tree" simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Maguire, Evidence of Guilt, 221 (1959). We

think it clear that the narcotics were "come at by the exploitation of that illegality" and hence that they may not be used against Toy.

This is stated as limiting the scope of the exclusionary rule rather than as carrying it into new ground.[4] United States v. Coplon, 185 F.2d 629, 637–640 (2 Cir. 1950), cert. denied, 342 U.S. 920, 72 S.Ct. 362, 96 L.Ed. 688 (1952), did say that the defense was entitled not only to see the logs of the tapped conversations but also to inquire whether the prosecution had been "set upon the trail" which "originally 'led' to 'tapping' Judith Coplon's telephones, to tracking her movements, and finally to detecting the crime" by illegal tapping of talks to which she had been a party, 185 F.2d at 639. On the other hand, the opinion related to the initiation of an investigation of the same crime first allegedly revealed by illegal wiretaps and instituted for that very purpose, a much clearer "exploitation of 'the primary illegality,'" see United States v. Edmons, 432 F.2d 577, 584 (2 Cir. 1970), than anything here claimed; and it is scarcely likely that Judge L. Hand, who wrote the *Coplon*

opinion, meant to overrule *sub silentio* what he had said in *Nardone* eight years earlier.[5] United States v. Tane, 329 F.2d 848 (2 Cir. 1964), also cited by the district court in *Schipani*, affords even less indication of an intention to undermine the holding in *Nardone* that an illegal wiretap would not confer immunity merely because it had intensified an existing investigation which might otherwise have been discontinued or, *a fortiori*, because it possessed a remote causal relation to the beginning of a new one that would lead to detection of an unrelated crime that had not yet even been planned. In *Tane* the identity of the witness, upon whose grand jury testimony the indictment "almost exclusively" rested, was derived from the illegal wiretaps and he was unwilling to testify until possession of the wiretaps was revealed.[6] Finally we do not read Judge Jameson's statement for this court in United States v. Schipani, 414 F.2d 1262, 1266 (2 Cir. 1969), which approved "the legal principles applied" by the district judge in rejecting Schipani's claims as endorsing the dicta in regard to the undermining of *Nardone*.[7]

4. The quotation from Professor Maguire refers to "evidence." He cites Judge Hand's decision in *Nardone* with apparent approval. Evidence of Guilt 222 n. 18 (1959).

5. Judge Swan was also a member of both panels.

6. The district court opinion in Schipani referred also to Harrison v. United States, 392 U.S. 219, 224, 88 S.Ct. 2008, 20 L.Ed. 2d 1047 (1968), and Smith v. United States, 120 U.S.App.D.C. 160, 344 F.2d 545 (1965). The *Harrison* case is not pertinent. The *Smith* case is one of many opinions by divided panels in the District of Columbia Circuit dealing with the problem of the "tainted witness," and is difficult to reconcile with the earlier decision in Smith and Bowden v. United States, 117 U.S.App.D.C. 1, 324 F.2d 879 (1963) (Burger, J.), cert. denied, 377 U.S. 954, 84 S.Ct. 1632, 12 L.Ed.2d 498 (1964). The New York Court of Appeals, quoting extensively from the latter opinion, has recently sustained the validity of a search warrant issued, in part, on the basis of an affidavit from a wit-

ness who, it was stipulated, "'was known to and gotten to by the police department solely through [an invalid] wiretap.'" People v. Mendez, 28 N.Y.2d 94, 320 N.Y.S.2d 39, 268 N.E.2d 778 (1971) (bracketed words in original). See Ruffin, Out on a Limb of the Poisonous Tree: The Tainted Witness, 15 U.C.L.A. L.Rev. 32, 45–59 (1967).

7. Apparently the only other case to consider Judge Hand's formulation in *Nardone*, United States v. Balistrieri, 403 F.2d 472, 477 (7 Cir. 1968), vacated and remanded for further proceedings in light of Alderman v. United States, 394 U.S. 165, 89 S.Ct. 961, 22 L.Ed.2d 176, and Giordano v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297, 395 U.S. 710, 89 S.Ct. 2032, 23 L.Ed.2d 654 (1969), quoted his statement approvingly. We do not regard the Supreme Court's remand as affording a contrary indication, since the two cited cases were, in pertinent part, concerned with the procedures to be followed by the district court when a claim of illegal eavesdropping is raised rather than the question at issue here: whether a tainted focus necessarily taints

██ As the Supreme Court has instructed, the excusionary rule "is calculated to prevent, not to repair. Its purpose is to deter—to compel respect for the constitutional guaranty in the only effectively available way—by removing the incentive to disregard it," Elkins v. United States, 364 U.S. 206, 217, 80 S.Ct. 1437, 1444, 4 L.Ed.2d 1669 (1960).[8] Courts must neither so narrow the rule as to impair its presumed deterrent effect[9] nor expand it in such a way that, in order to achieve a marginal increment in deterrence, society will pay too high a price. In preserving the requirement of "standing" in Alderman v. United States, *supra*, 394 U.S. at 171–176, 89 S.Ct. 961, the Court set its face against one attempt to broaden the exclusionary rule to maximize deterrence. We are confident it would likewise hold that to grant life-long immunity from investigation and prosecution simply because a violation of the Fourth Amendment first indicated to the police that a man was not the law-abiding citizen he purported to be would stretch the exclusionary rule beyond tolerable bounds.[10]

## II.

After his release from jail, Richards, acting in cooperation with the FBI, began frequenting Friedland's office and reporting what he had learned there. Early in May 1965, Friedland informed him that "a person coming in from Europe," later identified as Dennis Lorraine, "had a large amount of money and was interested in purchasing securities," presumably counterfeit, and asked Richards to help locate some. Lorraine later came to the office, and, after Richards introduced himself to Lorraine on his own, Friedland introduced Richards

to him. A few days later Friedland was visited by one Mahler, whom he had earlier described to Richards as an unreliable source of securities, again presumably counterfeit. Through an open door between Friedland's office and another, Richards heard Friedland tell Mahler of Lorraine's presence, resources and interest. Later Friedland introduced Mahler to Richards; they went to a restaurant where Friedland told Mahler that Richards was also attempting to obtain securities for Lorraine.

██ It is urged that Richards' overhearing the conversation between Friedland and Mahler was a forbidden invasion of Friedland's right to privacy. Richards was in Friedland's suite with the latter's permission and there is no suggestion that when he left Friedland's office for an adjoining one immediately before overhearing the conversation in question, Friedland could not see that the door remained open, although Richards had seated himself outside Friedland's line of vision. In light of what Friedland had already told Richards and was later to tell Mahler in Richards' presence, there was no reason why secrecy from Richards of his talk with Mahler should have been of concern to him. We thus see no significant distinction between this case and Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966). In any event the episode is inconsequential; Richards had given ample leads to the FBI quite apart from the overheard conversation, and he did not testify at the trial.

Since the argument of the appeal, we have received a letter from the appellant, stating that he was hospitalized some days previously and complain-

---

any further investigation resulting therefrom.

8. There is also, of course, "the imperative of judicial integrity." 364 U.S. at 222, 80 S.Ct. 1437. See also Harrison v. United States, *supra*, 392 U.S. at 224, n. 10, 88 S.Ct. 2008.

9. Whether the exclusionary rule actually does have a deterrent effect is another

question—and by no means an insubstantial one. See Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U.Chi.L.Rev. 665 (1970).

10. We do not undertake here to say what the result should be in other instances posed in United States v. Schipani, 289 F.Supp. at 62–63, or suggested by them.

**862**

ing that the United States Attorney refused to consent to an adjournment. He was not hospitalized when his counsel's brief was filed in December, 1970, but he claims that, although he was "medically unaware" of his condition, he "was medically, physically and otherwise mentally incompetent to confer with my counsel, to prepare my appeal, to work on briefs, or to offer my suggestions or ideas." Friedland was most capably represented by his retained counsel, Richard Owen, Esq.; we can see nothing that any suggestions at argument could have added. More than three years have elapsed since this court affirmed his well-deserved five-year prison sentence. We therefore direct that the mandate issue forthwith, and that the district court fix an early date for surrender. Any contentions with respect to the effect of this in light of the defendant's medical condition should be made, on an adversary basis, in the district court.

Affirmed.