**UNITED STATES v. NARDONE et al.**
**No. 208.**

Circuit Court of Appeals, Second Circuit.
April 7, 1942.

David V. Cahill and Louis Halle, both of New York City, for appellants.

Maxwell S. McKnight and Mathias F. Correa, U. S. Atty., both of New York City, for appellee.

Before L. HAND, SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This case comes before us now for the third time. The general nature of the charge and the evidence in support of it have been so fully set out in the two opinions of the Supreme Court (302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314; 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307), and in our own (2 Cir., 90 F.2d 630; 2 Cir., 106 F.2d 41), that we may dispense with any introduction and proceed at once to the points now mooted. The chief of these is whether the information got by "tapping" telephone wires and unlawfully seizing telegrams so far infiltrated the prosecution's preparation of the case as to make incompetent some part of the evidence introduced at the trial. Following the direction of the Supreme Court upon the second appeal, the trial judge held a preliminary hearing in which the prosecution accepted the burden of proving that none of the evidence which it proposed to use, and which it later did use, had been the result of leads from the "taps" and telegrams; and at the close of this hearing findings were made, among which was the following: "the testimony and evidence offered by the Government at this trial were derived wholly and completely from sources independent of any intercepted * * * communications, or information, clues or leads obtained therefrom." Such a finding should, we think, enjoy the same finality as a judge's finding in a civil action. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A. following section 723c. We address ourselves therefore to the evidence which supported it.

The case was principally prepared by one, Dunigan, an "assistant supervisor of the Alcohol Tax Unit." An informer named Murray told him some months before the "taps" or seizures were made that the defendants Nardone and Hoffman were members of a ring of alcohol smugglers which also included Leveque and Erickson, each of whom was the owner

of a "rum-running" vessel. Dunigan learned later that the rendezvous of these four men was the lobby of the Hotel Astor in New York, where they were seen also in company with Geiger—a radio operator working for Leveque—Kleb and Saunders. On December 20, 1935, after he had had the confederates under observation for some time, Dunigan began to "tap" the telephones which they used to talk with their accomplices, and this he continued until March 20, 1936, when Leveque, Nardone and some of the others were arrested. It was the admission of these "taps" that caused the first reversal. On December 16th Dunigan had already seized three telegrams under circumstances which—although the prosecution contests the point—we shall arguendo assume made the seizure unlawful. These had all been sent by Erickson; two of them were money orders transmitting funds to accomplices in Nova Scotia to finance the vessels carrying the alcohol, and the third was merely an appointment for a telephone talk on the same day. Much later—in April—Dunigan also seized a number of other telegrams, all but two of which were again money orders transmitting money from New York to Nova Scotia. (The other two cryptic messages could have played no part in the preparation of the trial.) The importance of the first three telegrams was that they "absolutely convinced" Dunigan "that a conspiracy had been entered into and it warranted any further investigation that was possible"; they led him "from the suspicious stage to the factual stage"; they were part of what aided in his "conclusion that Nardone and the others were in the conspiracy." The prosecution did not prove that they had not led Dunigan to begin to "tap" the telephones four days later; or that without the "taps" he would have pressed through his investigation to a successful conclusion.

However, neither telegrams nor "taps" were introduced at the trial; nor did they lead to the discovery of any of the evidence that was introduced, or contribute to the willingness of the witnesses to speak. The only ones as to which this could have been possible even theoretically were Leveque, Geiger, Lancaster and Velez. Leveque was the head and front of the ring and had pleaded guilty to two earlier indictments, one apparently laying the same crime as that now . before us, and the other an earlier. smuggling in South Carolina. Before the second trial came on he had served his time and had been released; but he was still under indictment for the Keansburg smuggling of November 22, 1935, which, since it had resulted in some shooting, became known at once well in advance of the seizure of the three telegrams. The only reasonable conclusion is that Leveque consented to testify in the hope of softening the prosecution towards him upon this last charge; certainly there is no reason to suppose that he was in any degree induced to do so because of any use of the illicit information. Geiger was known to Dunigan before December 16, 1935; one of his investigators has told him that if Leveque had a radio operator it would be Geiger; and another had seen Geiger with Leveque and Erickson on December 16th and again on December 19th, when Hoffman was also present. Geiger had been indicted with Leveque for the South Carolina smuggling, and had also pleaded guilty and served his time. It was only after his release and upon consultation with Leveque, with whom he appears to have been on friendly terms, that he consented to testify upon the second trial. (The prosecution had apparently been too suspicious of Leveque himself to use him until the third trial.) Again, there is no reason to suppose that Geiger's complaisance resulted from the use of any knowledge unlawfully acquired by Dunigan. Lancaster was a seaman who also had been concerned in the South Carolina smuggling for which he had been indicted; he pleaded guilty but was let off with a suspended sentence because of the time he had been in prison awaiting trial. After his release he at first refused to talk, but later—actuated apparently by hostility to Erickson—he became more friendly and helped implicate Hoffman. The "taps" or telegrams could not possibly have had any share in his change of mind. Of Velez nothing was known till the net was drawn on March 20, 1936, by the arrest of the ringleaders at the Belfort Restaurant in New York. He was seized along with the rest, released and never indicted; his name had not appeared in "taps," and no information or testimony obtained from him had its source in them. It is true that the arrest itself was the culmination of all that had gone before, in which the unlawfully acquired information had indeed had a part; but it contributed to the result only in so

far as it satisfied Dunigan that it would be worth his while to pursue the chase.

 The question therefore comes down to this: whether a prosecution must show, not only that it has not used any information illicitly obtained, either as evidence, or as the means of procuring evidence; but that the information has not itself spurred the authorities to press an investigation which they might otherwise have dropped. We do not believe that the Supreme Court meant to involve the prosecution of crime in such a tenebrous and uncertain inquiry, or to make such a fetich of the statute as so extreme an application of it would demand. On the last appeal the court made it abundantly clear that it did not contemplate a chase after will-o'-the-wisps. "Tenuous claims" are not "sufficient to justify the trial court's indulgence of inquiry into the legitimacy of evidence." The "claims * * * must satisfy the trial court with their solidity." We are not "to subordinate the need for rigorous administration of justice to undue solicitude for potential and, it is to be hoped, abnormal disobedience of the law." [308 U.S. 338, 60 S.Ct. 268, 84 L. Ed. 307.] Such expressions indicate no disposition towards the refinements inevitable in deciding how far the illicit information may have encouraged and sustained the pursuit. We hold that, having proved to the satisfaction of the trial judge that the "taps" and telegrams did not, directly or indirectly, lead to the discovery of any of the evidence used upon the trial, or to break down the resistance of any unwilling witnesses, the prosecution had purged itself of its unlawful conduct.

The first of the other supposed errors is that the judge refused to charge the jury that before considering the declarations of a conspirator, they must be satisfied beyond a reasonable doubt that those against whom they were to be used had entered the conspiracy. Thus, the request was that the jury should consider the declaration only after coming to a conclusion about another fact; an admonition presupposing a mental gymnastic impossible for anyone, judge or jury, though judges have at times supposed themselves capable of it. The competency of evidence is for the judge alone; any question of fact upon which it depends he must decide; if he admits it the jury may use it like other evidence—for whatever it proves to their minds—they can have no concern with rulings about evidence which, so far as it is possible, ought to be kept from their notice. Steele v. United States, 267 U.S. 505, 510, 45 S.Ct. 417, 69 L.Ed. 761; Ford v. United States, 273 U.S. 593, 605, 47 S.Ct. 531, 71 L.Ed. 793; United States v. Cotter, 2 Cir., 60 F.2d 689, 691; Wigmore § 2550. We do not indeed forget that at times courts do admit evidence against some of the accused and exclude it against others; and we concede that that practice is as unreal as to admit it conditionally. It would indeed be better to abandon the pretence that the jury can do that too; but not if the cost were to rule out the evidence altogether.

Kleb's declarations to Lancaster were made while the scheme was in progress; it had begun long before. Whether it was in actual furtherance of the venture is not so clear, but at least it was a communication between two of the parties during its active execution; and the judge might have found that it was made in prosecution of a scheme of such wide scope. The Keansburg incident we dealt with upon the second appeal; both Nardone and Hoffman had been active in the ring before it took place. The other alleged errors are trivial.

Convictions affirmed.