STATE of South Dakota, Plaintiff and Appellant,

v.

Elon Thomas PIERSON and Susan Pierson, Defendants and Respondents.

Nos. 11762, 11763, 11778.

Supreme Court of South Dakota.

Dec. 16, 1976.

Rehearing Denied Jan. 21, 1977.

Earl R. Mettler, Asst. Atty. Gen., for plaintiff and appellant; William J. Janklow, Atty. Gen., Pierre, on the brief.

John L. Maynes, Aberdeen, for defendant and respondent Susan Pierson.

Drew C. Johnson, Aberdeen, for defendant and respondent, Elon Thomas Pierson.

CHEEVER, Circuit Judge.

The defendants were charged with possession of marijuana in excess of one ounce, possession of amphetamines, and possession of a controlled substance with intent to distribute on May 12, 1975. Arrest warrants were issued on the same date. A preliminary hearing was held on June 18, 1975, with the various complaints being combined for purposes of the preliminary hearing. The defendants were bound over on all counts and informations were filed on June 19th. The defendants appeared, were arraigned, and entered pleas of not guilty. Subsequently, the defendants filed motions to suppress and to quash the search warrant. A hearing was held on such motions on the 16th of July, 1975, and subsequently the trial court entered its order suppressing the evidence and quashing the search warrant. The state made application for and obtained an order permitting an intermediate appeal dated November 6, 1975.

The matter was submitted on briefs without oral argument. We reverse.

On May 10, 1975, at about 7 p. m., the defendants appeared at the Sundown Motel in the City of Aberdeen. Defendant, Elon Thomas Pierson, went in the office to ar-

range for accommodations. Mr. David Allen Bunt, the manager of the motel, was at the desk. Mr. Pierson signed the registration card as Mr. and Mrs. Tom Pierson, No. 13, Holmes Trailer Court, Vermillion, South Dakota. The vehicle they were driving was a 1965 Rambler with Brown County license. Mr. Pierson indicated that they would be staying four days and volunteered the information that he was visiting his parents who lived at Richmond Lake. Mr. Bunt advised him that the normal procedure was for him to pay for the four nights in advance, that the room rental would amount to $44.08. Mr. Pierson advised him that he did not have money to pay the entire amount, but that he would be getting a check on Sunday and would be able to pay at that time. Mr. Pierson offered all the money he had which amounted to nine dollars and some cents. Mr. Bunt took the nine dollars and noted that amount to have been paid on the registration card. Mr. Bunt assigned the Piersons to room # 6 in the motel. He indicated that at the time Mr. Pierson came into the motel he thought him to be a construction worker who did not look too prosperous. Immediately after Mr. Pierson left the office, Mr. Bunt checked the telephone directory and was not able to note a Pierson at Richmond Lake. He also testified that this caused him to be somewhat uneasy about the Piersons.

Shortly after going to his room, Mr. Pierson made a phone call. The switchboard in the motel is of a type that when the phone is picked up in the room it rings the central switchboard of the motel. The switchboard operator answers the call and is given the desired phone number and the operator dials the number. When the party called answers, the operator can either disconnect or he can listen in on the conversation. Mr. Bunt testified that he listened in on the first call made and overheard something to the effect that Mr. Pierson wanted to borrow a scale from the party he was calling. The called party indicated that he did not loan his scale out. Shortly thereafter, Mr. Pierson placed another call and Mr. Bunt listened to a part of this conversation and overheard Mr. Pierson saying something about ten cents cheaper or a dime less. Mr. Bunt testified that both of these calls aroused his suspicion.

On Sunday, there was a great deal of traffic in and out of the motel room occupied by the Piersons. Mr. Bunt testified there were probably ten people who came and went from this room. He testified further that during the fifteen years he had been managing this motel he had never had so much traffic in and out of a private individual's room. He further classified the individuals as being rather "skruddy" looking people. On Sunday afternoon, about 1:30, he called the police department and talked to an officer there who indicated that he would have one of the detectives come over and see Mr. Bunt. Shortly thereafter, Captain Steven Oakes arrived at the motel and Mr. Bunt relayed to him the information that he had, starting with the telephone calls and other things which had aroused his suspicion. At the time that Captain Oakes arrived, there were several people in cars leaving the motel from the Pierson room. Captain Oakes recognized some of them as suspected drug users in the Aberdeen area. He noted the license numbers on their vehicles. At this time, Mr. Bunt was quite insistent that something be done, and Captain Oakes indicated to him that there was not enough evidence to proceed upon anything. Captain Oakes remained at the motel approximately thirty minutes. Things had quieted down so he returned to his home.

On Sunday, at the request of the Piersons, their motel room was not straightened up or cleaned. On Monday, they did not leave the motel room until rather late in the morning. The regular cleaning ladies had completed their work and left the motel. So Mr. Bunt sent his sister, who occasionally worked as a cleaning lady at the motel, and his brother in to take care of cleaning the Pierson room. He did tell them that he suspected there was some drug activity in and out of this room. In cleaning the room, they opened the dresser drawers, and in one drawer found a full bag and part of another

bag of what they thought was marijuana. In another drawer, they found a scale. They reported this to Mr. Bunt who in turn contacted the Chief of Police. He requested the brother and sister to come to the police department. After hearing their story, Captain Oakes showed them a bag of marijuana and each indicated that it appeared to be the same substance that they had found in the room, so he had each of them give him a written statement.

Captain Oakes proceeded to prepare an affidavit for a search warrant. In the affidavit, he recited the call that had been made to him by Mr. Bunt, the fact that he had visited the motel and his conversations with Mr. Bunt, wherein Mr. Bunt had relayed to him the information concerning the number of people coming and going to the room on Sunday, the conversations which Mr. Bunt had overheard on the two telephone calls—one referring to some grass and another referring to borrowing a scale. Captain Oakes recited that he had personally watched the activities of the people coming and going from motel room # 6 and had obtained the license numbers of cars and that he had recognized some of these people as having·a reputation for drug activity in and around Aberdeen. He then recited the finding of the marijuana and the scale by Mr. Bunt's brother and sister, and the fact that they had given written statements. He attached copies of these statements to his affidavit. Based upon this affidavit, a search warrant was obtained and taken to the motel by Captain Oakes. The Piersons were not at the motel at the time that he arrived. He waited until Mrs. Pierson arrived and then served the warrant upon her.

A search of the room revealed 29 one-pound packages of suspected marijuana and a part-package of suspected marijuana, together with some pills which were later analyzed and identified to contain amphetamines.

The prime thrust of each of the motions to suppress was that David Bunt had intentionally, deliberately, wrongfully, and illegally intercepted two telephone conversations originating from room # 6 of the Sundown Motel occupied by the Piersons on the evening of May 10, 1975, in violation of §§ 2510–2520, 18 U.S.C.

The trial court in its order of suppression found that David Bunt deliberately and wilfully listened to the two telephone conversations and that such interception was in violation of § 2515, 18 U.S.C. It further found that the issuance of the search warrant and the evidence obtained in the search were derivative of the information obtained by David Bunt's interception of the phone calls and that such evidence was inadmissible by reasons of the provisions of such section.

The plaintiff has urged three separate grounds for reversal of the court's decision. The first is that the evidence of the drugs should not have been suppressed as derived from an illegal search because the evidence was not obtained by any exploitation of the initial illegality. Secondly, the evidence of the drugs found in the defendants' motel room should not have been suppressed as derived from an illegal search because the evidence was made known to the authorities from a wholly independent source. A third ground for reversal is that the federal statute, § 2515, 18 U.S.C., excluding the evidence from state courts is an unconstitutional exercise of power by the federal government in violation of the Tenth Amendment.

■ The exclusionary rule of the Fourth Amendment does not apply to this case because there was no illegal search conducted by the state. It is clear that the Fourth Amendment applies only to governmental action, *Burdeau v. McDowell,* 1921, 256 U.S. 465, 41 S.Ct. 574, 65 L.Ed. 1048; *State v. Cundy,* 1972, 86 S.D. 766, 201 N.W.2d 236. Substantially all of the investigation involved here, prior to the issuance of a search warrant, was conducted by private individuals. There is absolutely no evidence that Mr. Bunt and his employees were acting as government agents. The police did not instruct or request them to take any action. The only investigation conducted by a police officer was the observations

made by Captain Oakes at the motel, and this investigation was in no respect illegal.

The exclusionary rule, which the defendants have asked the court to apply in this case, arises solely out of the wiretapping statutes, §§ 2510–2520, 18 U.S.C., which at § 2515 contain the following provisions:

"Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceedings in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter."

The legislative history of this section of the statute is reported in 1968 U.S.Code Congressional and Administrative News, pp. 2112, 2185, wherein the following statement was made:

"There is, however, no intention to change the attenuation rule. See *Nardone v. United States* [2 Cir.], 127 F.2d 521 * * *; *Wong Sun v. United States,* 83 S.Ct. 407, 371 U.S. 471 [9 L.Ed.2d 441] (1963)."

The *Nardone* case referred to in the legislative history was before the Supreme Court and the opinion was reported in 302 U.S. 379, 58 S.Ct. 275, 82 L.Ed. 314. This case involved the interpretation of a portion of the Communication Act of 1934 (Chapter 652, 48 Statutes at Large, 1064, § 605, 47 U.S.C.) which contained the following provisions:

"* * * no person not being authorized by the sender shall intercept any communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person * * *."

The original appeal involved the primary point of whether or not that particular portion of the statute was applicable to federal officers. The court held that it was and remanded the case to the District Court for further proceedings where it was retried and again appealed to the Supreme Court; the second opinion was reported in 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307. The Court delineated the issues involved in the second appeal as follows:

"The issue thus tendered by the Circuit Court of Appeals is the broad one, whether or no § 605 merely interdicts the introduction into evidence in a federal trial of intercepted telephone conversations, leaving the prosecution free to make every other use of the proscribed evidence." 308 U.S. at 339, 60 S.Ct. at 267, 84 L.Ed. at 311.

In connection therewith, the Court said:

"To forbid the direct use of methods thus characterized but to put no curb on their full indirect use would only invite the very methods deemed 'inconsistent with ethical standards and destructive of personal liberty.' * * * 'The essence of a provision forbidding the acquisition of evidence in a certain way is that not merely evidence so acquired shall not be used before the court, but that it shall not be used at all.'" 308 U.S. at 340–341, 60 S.Ct. at 267, 84 L.Ed. at 311.

The Court further said:

"Here, as in the *Silverthorne* Case, [*Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319], the facts improperly obtained do not 'become sacred and inaccessible. If knowledge of them is gained from an independent source they may be proved like any others * * *.'" 308 U.S. at 341, 60 S.Ct. at 268, 84 L.Ed. at 311.

The Court then went on to say:

"The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed. Once that is established—as was plainly done here—the trial judge must give opportunity, however closely confined, to the accused to prove that a substantial portion of the case against him was a fruit of the poisonous tree. This leaves ample opportunity to the Government to convince the trial court that its proof had an independent

origin." 308 U.S. at 341, 60 S.Ct. at 268, 84 L.Ed. at 312.

The case was remanded to the District Court for further proceedings; again it was retried and a conviction obtained. The third time it went before the Second Circuit Court of Appeals, Judge Learned Hand in his opinion, 127 F.2d 521, made the following statement:

"The question therefore comes down to this: whether a prosecution must show, not only that it has not used any information illicitly obtained, either as evidence, or as the means of procuring evidence; but that the information has not itself spurred the authorities to press an investigation which they might otherwise have dropped. We do not believe that the Supreme Court meant to involve the prosecution of crime in such a tenebrous and uncertain inquiry, or to make such a fetich of the statute as so extreme an application of it would demand." 127 F.2d at 523.

He further went on to say:

"Such expressions indicate no disposition towards the refinements inevitable in deciding how far the illicit information may have encouraged and sustained the pursuit. We hold that, having proved to the satisfaction of the trial judge that the 'taps' and telegrams did not, directly or indirectly, lead to the discovery of any of the evidence used upon the trial, or to break down the resistance of any unwilling witnesses, the prosecution had purged itself of its unlawful conduct." 127 F.2d at 523.

The other case referred to in the U.S.Code Congressional and Administrative News, supra, is that of *Wong Sun v. United States,* 1963, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, which appears to be the other leading case on the attenuation rule. In this case, the Court said:

"We need not hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police. Rather, the more apt question in such a case is 'whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint.'" 371 U.S. at 487–488, 83 S.Ct. at 417, 9 L.Ed.2d at 455.

■ We believe the rule thus laid down in the various *Nardone* cases and in the *Wong Sun* case is the rule which is applicable to the case at hand. Thus the question becomes whether or not, granting the establishment of a primary illegality, the evidence to which objection has been made was obtained by exploitation of that illegality or by means sufficiently distinguishable to be purged of the primary taint.

Just exactly what Mr. Bunt did overhear is not entirely clear from the record. In the affidavit and application for search warrant, Captain Oakes stated that Mr. Bunt had advised him he had overheard a part of two phone conversations—one in which reference was made to grass and the other where he had overheard an inquiry concerning the borrowing of a scale. At the preliminary hearing, however, Mr. Bunt testified that he heard all of one conversation in which the defendant wanted to borrow a scale and a part of a second conversation in which something was said about ten cents cheaper or a dime less. This was also his testimony at the suppression hearing. He did not testify in either hearing about hearing the word grass or pot used in the telephone conversations.

What role did the overhearing of these two conversations have in the ultimate discovery of the drugs in defendants' room? From the facts as outlined, it would appear that the role it played was extremely minimal. At the time the Piersons registered at the motel, Mr. Bunt became extremely suspicious. Mr. Pierson's appearance was that of a construction worker who was not too prosperous. They registered for four days and did not have sufficient money to even pay the first night's lodging. Mr. Pierson had indicated he was going to visit his parents. When Mr. Bunt checked the telephone book, he could find no one by that

name in the locality indicated. After hearing all of one telephone conversation and part of another, his suspicion concerning the occupants of room # 6 was heightened. However, Mr. Bunt did nothing until the following day. On Sunday morning, there was heavy traffic in and out of the defendants' room. Mr. Bunt's testimony was that in the years he had operated a motel he had never seen anything like it. The people who were coming and going to the Piersons' room were described by Mr. Bunt as being "skruddy" looking people. It was then and only then that he called the police. Captain Oakes responded to his call. He, too, observed some of the people coming and going and identified some of them as being people involved in the drug scene in the Aberdeen area. Still nothing was done. The following day, after the defendants had left the room, Mr. Bunt sent his sister and brother to clean the room. He did advise them he was suspicious of drug activities out of the room, but he did not instruct them to search the room. They were to clean. It was during the cleaning operations that drugs were discovered. This was reported to Mr. Bunt and he in turn conveyed the information to the police. It was then, after the finding of the marijuana by the maid, that application was made for a search warrant. The finding of the marijuana was wholly independent of the initial eavesdropping and constituted an independent source of evidence necessary to support a search warrant which resulted in the seizure of the contraband in question.

We feel that the suppressed evidence was purged of the primary taint of the intrusion by Mr. Bunt on the two telephone conversations. To hold this evidence was derived from the initial conversations is to give a strained interpretation that is not in accord with either the *Nardone* or the *Wong Sun* case.

The order of the trial court quashing the issuance of the search warrant and ordering the return of the property seized is hereby reversed and the matter remanded for further proceedings.

In connection therewith, I think it should be made clear that Mr. Bunt, in any further proceedings, cannot testify as to the conversations he overheard. This is clearly provided by the provisions of § 2515, 18 U.S.C.

By reason of the conclusions reached, the court does not pass upon the claim of plaintiff that § 2515, 18 U.S.C. is unconstitutional in applying it to the state courts.

WINANS, J., concurs.

DUNN, C. J., concurs specially.

COLER and ZASTROW, JJ., dissent.

CHEEVER, Circuit Judge, sitting for WOLLMAN, J., disqualified.

DUNN, Chief Justice (concurring specially).

I concur in the majority opinion and would reverse the trial court's order. We are not dealing with a private residence in this case. It is a public motel with a switchboard and where the owners and the maids have keys and a perfect right to enter the rooms to inspect or perform their duties. While it is true that the motel manager advised his brother and sister of his suspicions surrounding room # 6 and suggested that they look around, it is also true that these people normally check desk drawers as part of their cleaning duties. Implementing this policy gave the state a lawful source of knowledge of the facts independent of any information supplied by the alleged unlawful eavesdropping. I note that the United States Supreme Court in *Brown v. Illinois,* 1975, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416, reaffirmed the "exploitation" test of *Wong Sun,* cited in the majority opinion, as opposed to a "but for" test in determining whether an illegal taint has been purged.

Finally, a reading of the entire record here does not indicate that the police were engaged in a flagrant abuse of the defendants' Fourth Amendment rights. Instead, the police acted in good faith upon the affidavits of persons lawfully engaged in their duties as employees of the motel. Further, they conducted an independent

surveillance of the activities in and out of the room before acting. Defendants have no basis for a Fourth Amendment complaint where they attempt to conduct a retail drug business out of a motel room.

COLER, Justice (dissenting).

I would affirm the trial court. I agree with Justice Zastrow's view of the evidence which supports the trial court as set forth in his dissent, and I am convinced that the trial court's order is also proper considering the import of SDCL 23–13A.

While the issue was not thoroughly briefed in either the trial court or this court, and the proposed opinion declines to pass upon the constitutionality of the federal wiretap statutes but nevertheless declares that the federal act controls further proceedings, I do not believe this court should close its eyes to legislative enactments of South Dakota which state the policy to be adhered to regarding interception of telephone conversations in this state. I find it incredible that the attorney general argues U.S.C. § 2515 to be an unconstitutional exercise of power by the federal government in violation of the tenth amendment. Our legislature has, by enactment of chapter 158 of the Session Laws of 1969, which was entitled,

> "AN ACT Entitled, An Act authorizing the interception of wire or oral communications by certain public officials in conformity with Chapter 119 of Part I of title 18, United States Code; defining certain terms; establishing procedures governing application for, and granting of, court orders applicable thereto; and, designating and enumerating specific offenses for which such interceptions may be made."

clearly made 18 U.S.C. §§ 2510 to 2520 applicable in this state.

Section 2 of ch. 158, SL 1969, set forth as SDCL 23–13A–2, states:

> "It is the intent of this chapter to conform the requirements of all interceptions of wire and oral communications conducted by investigative or law enforcement officers in, this state to the provisions of chapter 119 of the United States Code."

A statement is made in the majority opinion that Mr. Bunt will not be allowed to testify "in any further proceedings." I believe that Mr. Bunt must testify at a suppression hearing if a further hearing is mandated, to determine if the information gleaned from wiretap was illegal and, if so, was it exploited. Once the wiretap is found to be illegal and information from the wiretap was exploited, then Mr. Bunt will not be allowed to testify as to that evidence. SDCL 23–13A–8, 23–13A–1(5), 18 U.S.C. § 2515. This exclusionary rule incorporated into the federal act and accepted as the law of this state by SDCL 23–13A, grew out of the abuses existing during the passage of the earlier federal act. The purpose of the federal act is: (1) to protect privacy of wire and oral communications, and (2) to delineate on a uniform basis circumstances and conditions under which interception of wire and oral communications may be authorized, *United States v. Cafero*, 1973, 3 Cir., 473 F.2d 489 (footnote 8, 1968), cert. denied 417 U.S. 918, 94 S.Ct. 2622, 41 L.Ed.2d 223; see also 1968 U.S.Code Cong. & Admin.News, at p. 2153; and, perhaps more basic, to limit initiation of wiretap applications to publicly responsible officials, subject to the political process. *United States v. Giordano*, 1972, 4 Cir., 469 F.2d 522, affirmed 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341. See also 1968 U.S.Code Cong. & Admin.News, p. 2185.

From reading the transcript and in agreeing with Justice Zastrow's assessment, I would conclude that the information from the wiretap was exploited. Such illegal wiretaps should not be considered less harmful when they were initiated by a "concerned citizen." Under SDCL 23–13A–1(5) and 23–13A–8 a private individual is subject to the Act's restrictions. As these restrictions were not complied with, and as the information from the illegal wiretap was exploited, I would affirm the trial court's suppression order.

ZASTROW, Justice (dissenting).

Although the factual statement in the majority could justify a reversal of the trial court's decision, the testimony at the suppression hearing could have been, and apparently was, interpreted quite differently by the trial court. However, there were no findings of fact and conclusions of law entered with the trial court's order suppressing the evidence seized upon the execution of the search warrant.

The procedure in this situation has been clearly stated in *State v. Stumes,* 1976, S.D., 241 N.W.2d 587:

"It is abundantly clear, however, that absent the necessary findings of fact and conclusions of law which make up a 'decision,' RCP 52(a); *Bunnell v. Kindt,* 1968, 83 S.D. 377, 159 N.W.2d 923, this court's review is seriously hampered, if not made impossible, because of the inability of this court to determine the credibility of the witnesses which determination is within the purview of the trial court before whom the witnesses appeared.

\*      \*      \*      \*      \*      \*

"The total lack of findings of fact and conclusions of law in the present case causes us to remand this case for a determination of the factual issue upon the evidence previously adduced." 241 N.W.2d at 591.

If this case is not to be remanded, the evidence must be viewed in the light most favorable to support the trial court's decision. *State v. Nelson,* 1974, S.D., 220 N.W.2d 2; *State v. Kiehn,* 1972, 86 S.D. 549, 199 N.W.2d 594.

The trial court in its memorandum opinion expressly adopted as "accurate" the statement of facts set forth in the defendant's memorandum brief. The facts adopted by the trial court indicate that the entire sequence of events which culminated in the discovery of the marijuana was set in motion by the motel manager's deliberate and wilful interception of the defendant's telephone communications. A close reading of the transcripts reveals that there were two telephone calls intercepted by Mr. Bunt.

One was a local call to Thomas Pierson's parents, which should have allayed Bunt's suspicions about the parents' residence.

The trial court's "finding" that Bunt had deliberately and intentionally "listened in" on the telephone conversations, although supported by the testimony, was in fact based upon the state's stipulation that the interception of the calls was deliberate. The stipulation occurred when Bunt repeatedly invoked the "5th Amendment" when questioned about the circumstances under which he "listened in" on the telephone conversations. As noted by the majority, exactly what Bunt did overhear is not entirely clear from the record, due in large part to his refusal to testify about the telephone conversations.

The question regarding the "policy" of the motel to clean the desk drawers was raised at the preliminary and suppression hearings. Bunt's testimony at the preliminary hearing was that it was the duty of the "cleaning lady" to check the drawers. Following the testimony of the cleaning lady to the contrary, and evidence that the drawers were not routinely checked, Bunt then testified at the suppression hearing that the policy was that the brother was to check the drawers. Another "policy" of the motel was that the rooms of customers staying more than one night would not be cleaned unless there was a specific request by the customer. Here there was a request that the room not be cleaned. Although that request was honored on Sunday, it was not honored on Monday following Bunt's conversation with Captain Oakes.

Bunt testified that Captain Oakes left "the impression" that Bunt or someone else would have to see an illegal substance before the police could act. Bunt then discussed the matter with his sister and brother-in-law, telling them of his suspicions and the inability of the police to act.

On Monday, Bunt, his sister and his brother waited in the motel office until the defendants left their room. At no time did Bunt follow the normal practice of contacting the room to inquire whether the occupants desired to have the room cleaned.

Immediately after the defendants departed, Bunt's sister and brother went to the room with the instruction: "There may be drugs too, look around." Captain Oakes recalled that Bunt had indicated his instructions had been to "look for some pot." The sister, who was not the regular cleaning lady, went immediately to the desk drawers. Upon discovering the plastic bags of marijuana, she and her brother went back to the motel office to advise Bunt of the discovery. The brother then returned to the defendants' room and looked in additional drawers until the scale was found. The majority's conclusion that the only purpose of the entry into the defendants' room was to clean is not the only conclusion which could be reached from the testimony. There was no evidence of any actual cleaning of the room, even though the defendants did not return until 6:30 p. m.

Although certainly not controlling, the magistrate, in an affidavit, stated that in issuing the search warrant he had relied upon the information obtained from the intercepted telephone conversations and upon the assertion in the application that the interception had been "inadvertent."

Viewing the evidence in the light most favorable to the trial court's decision, it is difficult to find, as does the majority, that there is no evidence that Bunt and his employees were acting as government agents; that the police did not instruct or request Bunt to take such action; that the brother and sister were engaged only in cleaning operations; or that the intentional eavesdropping by Bunt was not exploited by the police officer.

The trial court was in a better position to determine the credibility of the witnesses and to interpret the disputed testimony. *State v. Stumes,* supra; *State v. Starkey,* 1976, S.D., 247 N.W.2d 493. For that reason, the case should be remanded to the trial court for proper findings of fact and conclusions of law. If the *Stumes* procedure is to be abandoned, the trial court's decision does not appear to be erroneous and the suppression order should be affirmed.