**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Richard J. GORDON,**
**Defendant-Appellant.**

**No. 1318, Docket 80–1327.**

United States Court of Appeals,
Second Circuit.

Argued April 21, 1981.
Decided July 28, 1981.

William J. Dreyer, Sp. Asst. U.S. Atty., Albany, N.Y., George H. Lowe, U.S. Atty., N.D. of New York, Albany, N.Y., for plaintiff-appellee.

Lawrence H. Schwartz, Stiller, Schwartz & Kaswell, P.C., Washington, D.C. (Barry H. Gottfried, Barbara Kammerman, Washington, D.C., of counsel), for defendant-appellant.

Before FEINBERG, Chief Judge, OAKES, Circuit Judge and BONSAL,* District Judge.

BONSAL, District Judge:

Richard J. Gordon appeals from a judgment of conviction on nine counts after a jury trial in the United States District Court for the Northern District of New York (James T. Foley, J.). An indictment filed on November 2, 1979 charged Gordon with eight counts of mail fraud, in violation of 18 U.S.C. § 1341, and one count of interstate transportation of stolen property, in violation of 18 U.S.C. § 2314. A second indictment, filed on March 28, 1980, charged Gordon with one count of making a false statement to a bank, in violation of 18 U.S.C. § 1014, and one count of interstate transportation of stolen property.

By order dated May 30, 1980, the two indictments were consolidated. Following a three-week jury trial, Gordon was convicted on Counts 1, 2, and 4–8, charging mail fraud; Count 9, charging the interstate transportation of stolen property; and Count 10, charging the making of a false statement to a bank.

On July 25, 1980, Gordon was sentenced to five years' imprisonment on each of Counts 1, 2, and 4–9, the periods to run concurrently; to a fine of $10,000 on Count 9; and to a term of imprisonment of two years on Count 10 of the indictment, to run consecutively.

Gordon does not contest the sufficiency of the evidence; he appeals on a number of procedural grounds, challenging various rulings by Judge Foley before and during the trial. See *United States v. Gordon*, 493 F.Supp. 808 (N.D.N.Y.1980) (*Gordon I*); *United States v. Gordon*, 493 F.Supp. 814 (N.D.N.Y.1980) (*Gordon II*); *United States v. Gordon*, 493 F.Supp. 822 (N.D.N.Y.1980) (*Gordon III*).

We affirm.

### THE FACTS

During the time specified in the indictments, Gordon was the president of Lifelines Management Corp. ("Lifelines"), a corporation operating in Latham, New York which performed financial and tax planning services for businesses and individuals. Gordon also served as the president of other enterprises in the fields of insurance and investment planning.

---

* Of the United States District Court for the Southern District of New York, sitting by designation.

The jury found that Gordon devised a scheme to defraud three individuals,[1] Dominic Capone, Elizabeth Merkel, and Donald Green, Jr., by inducing them through false pretenses to pay for the purchase of certificates of deposit and telephone equipment to be leased for tax purposes. Proof at trial established that Gordon received from Capone in excess of $200,000. Gordon represented that at least $100,000 of this money would be invested in certificates of deposit. Gordon purchased no certificates of deposit for Capone. Instead, through a series of bank transfers, Gordon converted the money to his own use.

The jury also found that Gordon defrauded Elizabeth Merkel in a similar fashion by obtaining over $240,000 from her upon the representation that the money would be invested in certificates of deposit. Merkel, like Capone, received periodic "interest" payments, drawn from Gordon's personal funds, which he represented to be interest accrued on certificates of deposit. Proof at trial established that Gordon made false statements to a bank for the purpose of obtaining a loan of $75,000 in Merkel's name.

The jury also found that Donald Green paid $28,000 to Gordon for investment in a "phone lease," which Gordon had described to Green as a tax shelter involving the leasing of a telephone system. Gordon purchased no telephone equipment, but did mail to Green a falsified invoice purporting to show that equipment valued at $28,000 had been acquired. Gordon also informed Green that he had invested over $7,000 of Green's money on behalf of the Pension Plan for Green's employees, when in fact he had deposited this money in his personal checking account.

During the week of September 24, 1979, Gordon closed down Lifelines and his other insurance businesses. This sudden decision was precipitated by an inquiry made by Norbert Meister concerning the certificate of deposit which Gordon had purportedly purchased for the Georgetown University Community Health Plan.

On September 25, 1979, Gordon decided to leave town and instructed an employee, James Meyers, a priest on leave of absence, to inform an officer of Lifelines that the business would be closed. Meyers testified at trial that on the same day, Gordon made withdrawals from local banks and informed him by telephone that he was travelling under assumed names and "was working to disguise his physical appearance."

On October 4, 1979, representatives of the New York State Superintendent of Insurance furnished affidavits to Justice Edward Conway of the New York Supreme Court alleging that Gordon, a licensed insurance agent, had discharged the employees of Lifelines and of Spectrum Planning Corp. and had made no arrangements to service his customers.

Pending hearing and determination of a motion for injunctive relief, Justice Conway appointed the New York Superintendent of Insurance as temporary receiver empowered to "take and hold all real and personal property located at 8 Stanley Circle, Latham, New York and belonging to such defendants . . . and to take whatever measures are deemed appropriate or necessary to gain access to the premises and to the records and to control such premises and records to protect the interests of the policyholders which may be affected by defendants' illegal actions." On October 12, 1979, the order was amended to authorize the seizure of documents at Gordon's Plattsburgh office.

On October 4 and 12, 1979, employees of the Insurance Department seized certain documents from Gordon's offices. Shortly thereafter, copies of these documents were provided to the United States Attorney for the Northern District of New York.

1. The jury found Gordon not guilty of defrauding a fourth individual named in Count 3 of the indictment, Norbert Meister, the former vice-president of the Georgetown University Community Health Plan. The jury found Gordon guilty of transporting in interstate commerce a check for $100,000, which he knew to be stolen, given to him by Meister on March 23, 1979 (Count 9).

In Washington, D.C., on October 4, 1979, FBI Special Agents arrested Gordon in a closet of the apartment of Joseph DeVito. While making the arrest, they observed on a table in the living room of the apartment four ticket folders labeled "British Airways" and "Concorde". The agents examined the folders, which they found to contain four round-trip tickets to Paris in the names of Gordon and DeVito, recorded the information contained on the tickets, and left them in the apartment. While in the apartment, Gordon attempted to reach his attorney by telephone, but was unable to do so.

While taking Gordon from the apartment to the FBI Field Office, the agents provided Gordon with an Advice of Rights form and explained to him his constitutional rights. Gordon stated that he did not wish to make a statement at that time.

At the Field Office, Gordon was again unsuccessful in contacting his attorney by telephone. Shortly thereafter, after he had been photographed and fingerprinted, Gordon was informed of the basis for his arrest. Agent Richardson testified at the suppression hearing that at this time, Gordon asked if he might re-read the Advice of Rights form provided to him earlier. Richardson testified that Gordon, after re-reading the form, expressed a desire to furnish information concerning "somebody else that should be arrested for the same thing."

Gordon thereupon signed the waiver portion of the Advice of Rights form and made a statement to the agents, a summary of which was prepared by Richardson. An examination of this summary reveals the statement to be largely exculpatory in nature. The summary provides in part:

"Gordon believes it was Meister who prompted the actions against Gordon by going to the U.S. Attorney (USA) in Albany, New York in an attempt to keep from being charged himself. However, documents which Gordon knows exist, will show that Meister knew exactly what was going on in, and personally benefited from, transactions between GUCHP and Lifelines.

. . . .

... [Gordon] would only say the present charges against him would never have been brought if he had not met Norbert Meister. ` Gordon quickly added that he was in no way admitting to the charges, but rather was advising that if the FBI knew of Meister's involvement, Meister 'would not be let out of Albany.' "

Later that afternoon, Agent Richardson returned to the apartment of Joseph DeVito, who permitted a search during which Richardson discovered two deposit slips in a gym bag which reflected a transfer of $50,000 from Gordon's savings account to his checking account at the Marine Midland Bank.

## DISCUSSION

*The Seizure of Records by the Superintendent of Insurance*

Gordon contends that the warrantless searches of his offices of October 4 and October 12, 1979 by representatives of the Insurance Department violated his Fourth Amendment rights and that documents seized during the searches should have been suppressed at trial. Some of these records, Gordon argues, were unrelated to his insurance business. We are unpersuaded by these arguments.

The Superintendent of Insurance was appointed temporary receiver for Lifelines and Spectrum Planning, Gordon's insurance businesses, pursuant to Section 6401 of New York Civil Practice Law and Rules.[2] Under

2. Section 6401 provides:
"Appointment and powers of temporary receiver

(a) Appointment of temporary receiver; joinder of moving party. Upon motion of a person having an apparent interest in property which is the subject of an action in the supreme or a county court, a temporary receiver of the property may be appointed, before or after service of summons and at any time prior to judgment, or during the pendency of an appeal, where there is danger that the property will be removed from the state, or lost, materially injured or destroyed. A motion made by a person not already a party to the action consti-

the circumstances confronting the Superintendent, the warrantless seizure of the documents in question by his employees was constitutionally permissible.

■ The Supreme Court has most recently addressed the question of warrantless inspection in *Donovan v. Dewey*, —— U.S. ——, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981). Holding that warrantless inspections of mines pursuant to Section 103(a) of the Federal Mine Safety and Health Act of 1977 did not violate the Fourth Amendment, the Court observed:

> "Our prior cases have established that the Fourth Amendment's prohibition against unreasonable searches applies to administrative inspections of private commercial property. *Marshall v. Barlow's, Inc.*, 436 U.S. 307 [98 S.Ct. 1816, 56 L.Ed.2d 305] (1978); *See v. City of Seattle*, 387 U.S. 541 [87 S.Ct. 1737, 18 L.Ed.2d 943] (1967). However, unlike searches of private homes, which generally must be conducted pursuant to a warrant in order to be reasonable under the Fourth Amendment [footnote omitted], legislative schemes authorizing warrantless administrative searches of commercial property do not necessarily violate the Fourth Amendment. See, *e. g., United States v. Biswell*, 406 U.S. 311 [92 S.Ct. 1593, 32 L.Ed.2d 87] (1972); *Colonnade Catering Corp. v. United States*, 397 U.S. 72 [90 S.Ct. 774, 25 L.Ed.2d 60] (1970). The greater latitude to conduct warrantless inspections of commercial property reflects the fact that the expectation of privacy that the owner of commercial property enjoys in such property differs significantly from the sanctity accorded an individual's home, and that this privacy interest may, in certain circumstances, be adequately protected by regulatory schemes authorizing warrantless inspections. *United States v. Biswell, supra* [406 U.S.] at 316 [92 S.Ct. at 1596]."
> *Id.* —— U.S. at ——, 101 S.Ct. at 2537–38.

The Fourth Amendment, the Court noted, protects a commercial property owner from "*unreasonable* intrusions onto his property by agents of the government," *Id.* (emphasis in original). Under certain circumstances, however, property may be subject to warrantless inspection when Congress has "reasonably" determined that such inspection is necessary to further a regulatory scheme and the "regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Id.*

Gordon was engaged in the insurance business, an industry subject to a long-standing, complex and pervasive pattern of regulation by the state of New York. In light of this "close supervision and inspection," *Colonnade, supra* 397 U.S. at 77, 90 S.Ct. at 777, Gordon's expectation of privacy was substantially reduced. Moreover, he is deemed to have consented to the regulatory restrictions placed upon him. It is of no moment that this regulatory scheme is of state, and not federal, origin, as in *Dewey*. See *Frey v. Panza*, 621 F.2d 596 (3d Cir.), *cert. denied*, 449 U.S. 1035, 101 S.Ct. 611, 66 L.Ed.2d 497 (1980).

The Superintendent of Insurance had reason to seek the remedy of temporary receivership under New York law and to conduct the searches in question pursuant to his authority as a receiver. Gordon had abandoned the premises of Lifelines and Spectrum Planning after directing an associate to shut down their operations. The offices were locked and telephone service had been

---

tutes an appearance in the action and the person shall be joined as a party.

(b) Powers of temporary receiver. The court appointing a receiver may authorize him to take and hold real and personal property, and sue for, collect and sell debts or claims, upon such conditions and for such purposes as the court shall direct. A receiver shall have no power to employ counsel unless expressly so authorized by order of the court. Upon motion of the receiver or a party, powers granted to a temporary receiver may be extended or limited or the receivership may be extended to another action involving the property.

(c) Duration of temporary receivership. A temporary receivership shall not continue after final judgment unless otherwise directed by the court."

discontinued. Indeed, there existed a substantial likelihood that Gordon's insurance customers would suffer financial harm if remedial action was not quickly taken. Under such circumstances, the need for swift, unannounced inspection was demonstrable.

In seeking an appointment as temporary receiver, the Superintendent of Insurance acted pursuant to statutory authority. Section 24 of New York Insurance Law provides that the Superintendent may "require the production of any books, papers, records, correspondence, or other documents which he deems relevant to the inquiry." *See also* New York Insurance Law, Sections 35, 526, 528. After unsuccessfully attempting to require such production through the exercise of his subpoena power, the Superintendent made a showing before Justice Conway, pursuant to CPLR Section 6401, that "property [would] be removed from the state, or lost, or .materially injured or destroyed." The Superintendent demonstrated exigent circumstances. On this showing, Justice Conway appointed him as receiver.

Gordon now challenges for the first time the sufficiency of the evidence relied upon by Justice Conway. Having failed to raise the issue at trial, he may not do so on appeal.

Accordingly, we find the conduct of the Superintendent of Insurance, in light of his effort to minimize the harmful consequences of fraudulent conduct in the insurance industry, authorized by New York statutes and constitutionally permissible under the circumstances presented. *Dewey, supra* —— U.S. at ——, 101 S.Ct. at 2539–41. *See also United States ex rel. Terraciano v. Montanye*, 493 F.2d 682, 685 (2d Cir.), *cert. denied*, 419 U.S. 875, 95 S.Ct. 137, 42 L.Ed.2d 114 (1974); *Matter of Carlson*, 580 F.2d 1365, 1379 (10th Cir. 1978).

■ Gordon argues that even if the appointment of a temporary receiver was proper, the use at trial of records seized by the Superintendent from Gordon's non-insurance businesses was impermissible, since these documents were the fruits of an overly-broad search. This argument is without merit. Gordon's failure to develop an adequate factual record in the district court precludes him from challenging the breadth of the search on appeal.

■ We are equally unpersuaded by Gordon's contention that the Superintendent was without authority to turn over the seized records to federal prosecutors. On the contrary, after discovering evidence of fraudulent conduct, the Superintendent was duty-bound to furnish the documents to appropriate law enforcement agencies. Gordon's closing of his offices and his leaving town made it appropriate to alert the federal authorities.

In view of the foregoing, Judge Foley properly refused to suppress the seized documents. *See Gordon I, supra*, 493 F.Supp. at 813–814.

*Joinder of the Counts and consolidation of the Indictments*

Gordon contends that the joinder of the nine counts of the first indictment, involving four different people, was improper and that the district court should have severed these counts to allege four separate schemes involving four separate victims. Gordon also argues that the consolidation of the two indictments for trial violated Rule 13 of the Federal Rules of Criminal Procedure and was highly prejudicial to his defense. We disagree.

■ The first indictment recites eight counts of mail fraud and one count of interstate transportation of stolen property. We agree with the district court's conclusion that the joinder of counts in the first indictment was permissible under Rule 8(a) of the Federal Rules of Criminal Procedure because the acts of mailing charged in the first eight counts formed part of a "common and continuous scheme and plan...." *Gordon II, supra*, 493 F.Supp. at 818. In each of these counts, Gordon was alleged to have abused his position as a financial advisor for the purpose of defrauding his clients.

This Court has stated that "too precise an identity between the character of the offenses" charged in one indictment should

not be required. *United States v. Werner,* 620 F.2d 922, 926 (2d Cir. 1980). Here it is sufficient that Gordon allegedly misused his particular position to accomplish his fraudulent purposes in each of the counts charged. *See also United States v. Rabbitt,* 583 F.2d 1014, 1021 (8th Cir. 1978), *cert. denied,* 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). Moreover, Gordon's representations to the individuals named in the indictment were similar in nature; in each case he promised to invest money in certificates of deposit or other property.

Gordon also challenges the consolidation of the two indictments for trial. The second indictment, dated March 28, 1980, charged Gordon with the making of a materially false statement in a loan application and with the interstate transportation of stolen property.

■ We are persuaded that the two indictments arose out of connected transactions, and accordingly we hold that the consolidation was proper.

Rule 13 of the Federal Rules of Criminal Procedure provides in part: "The Court may order two or more indictments . . . to be tried together if the offenses . . . could have been joined in a single indictment." In *United States v. Halper,* 590 F.2d 422, 428 (2d Cir. 1978), we held that a Medicaid fraud indictment and an income tax evasion indictment were not based on the "same act or transaction," nor did the indictments arise out of connected transactions, and that, accordingly, consolidation was improper. Here, unlike *Halper,* there is a clear connection between the acts charged in the two indictments. Our examination of the record satisfies us that Judge Foley was correct in finding that "the alleged transactions upon which the charges in the second indictment are based do intertwine and connect together with transactions in several counts of the first so as to constitute part of a common scheme to obtain moneys by fraud." *Gordon II, supra,* 493 F.Supp. at 821. We agree that the considerations favoring consolidation outweighed the prejudice to the defendant. *See United States v. Barrett,* 505 F.2d 1091, 1105 (7th Cir. 1974),

cert. denied, 421 U.S. 964, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975).

*Gordon's In-custody Statement to the FBI*

■ FBI Agent Richardson testified at the suppression hearing that Gordon, after being informed of the nature of the charges on which he was arrested, requested that he be permitted to re-read the Advice of Rights form. After doing so, Richardson testified, Gordon expressed a desire to provide information about "somebody else in Washington that should be arrested for the same thing." Our review of Richardson's summary of Gordon's subsequent statement, made after he signed the waiver, reveals the statement to be exculpatory in nature and designed, it would appear, to procure the arrest of Norbert Meister, one of the individuals named in the indictment as an individual defrauded by Gordon.

Gordon contends that the district court erred in admitting in evidence this statement, *see Gordon I, supra,* 493 F.Supp. at 812–813, since only shortly before making the statement he had declined to waive his *Miranda* rights and had attempted to reach his attorney by telephone. Since he invoked his constitutional rights, Gordon argues, all his subsequent statements were made against his will and were therefore inadmissible in evidence.

In *Edwards v. Arizona,* —— U.S. ——, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the Supreme Court held that an accused, having invoked his right to counsel, "is not subject to further interrogation by authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversation with the police." *Id.* at ——, 101 S.Ct. at 1885. We are satisfied that Gordon initiated such communication and that the " 'particular facts and circumstances surrounding [the] case, including the background, experience and conduct of the accused' ", *id.* at ——, 101 S.Ct. at 1884, quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938), support the district court's finding that Gordon voluntarily signed the waiver after he re-read it at his own request. Moreover, Gordon's waiver

appears to constitute in all respects "a knowing and intelligent relinquishment or abandonment of a known right or privilege." *Id.* Gordon's cautious behavior before volunteering his statement, when considered in light of the content of the statement itself, persuades us that this decision to proceed without counsel was carefully considered, notwithstanding his previous efforts to reach his attorney by telephone. *See also Rhode Island v. Innis,* 446 U.S. 291, 299–300, 100 S.Ct. 1682, 1688–1689, 64 L.Ed.2d 297 (1980); *Fare v. Michael C.,* 442 U.S. 707, 724–726, 99 S.Ct. 2560, 2571–2572, 61 L.Ed.2d 197 (1979); *Michigan v. Mosley,* 423 U.S. 96, 108–109, 96 S.Ct. 321, 328–329, 46 L.Ed.2d 313 (1975) (White, J., concurring).

Gordon's statement was properly received in evidence at trial.

*Remaining Contentions on Appeal*

■ Gordon argues that the district court should not have admitted the testimony of his employee James Meyers, a priest employed while on leave of absence from his church. *See Gordon III, supra,* 493 F.Supp. at 822. Gordon contends that Meyers' testimony was based on conversations protected by the priest-penitent privilege. We find this argument wholly without merit. The district court correctly concluded that the conversations between Gordon and Meyers related to business relationships, not spiritual matters, and that Meyers was enlisted by Gordon to procure the business of Norbert Meister. *Gordon III, supra,* 493 F.Supp. at 823–824; *see Trammel v. United States,* 445 U.S. 40, 51, 100 S.Ct. 906, 912–913, 63 L.Ed.2d 186 (1980); *United States v. Wells,* 446 F.2d 2, 4 (2d Cir. 1971).

■ Gordon also contends that airline tickets discovered and inspected by FBI agents during his arrest in the apartment of Joseph DeVito in Washington, D.C. were found as a result of an unlawful search and seizure violating the Fourth Amendment. The district court properly declined to suppress this evidence after finding that the agents acted reasonably in moving Gordon to the living room of the apartment in which he was arrested, where they discover-

ed, in plain view, "conspicuous and brightly colored" ticket envelopes. *Gordon I, supra,* 493 F.Supp. at 811. *See Coolidge v. New Hampshire,* 403 U.S. 443, 465–66, 91 S.Ct. 2022, 2037–38, 29 L.Ed.2d 564 (1971); *United States v. Rollins,* 522 F.2d 160, 166 (2d Cir. 1975), *cert. denied,* 424 U.S. 918, 96 S.Ct. 1122, 47 L.Ed.2d 324 (1976). Under the circumstances here presented, we believe that the agents were fully justified in inspecting the tickets, especially in light of Gordon's recent flight.

■ We are equally unpersuaded by Gordon's contention that the Government began its investigation of his accounts at the Marine Midland Bank only after conducting an illegal search of DeVito's apartment, which revealed, inside a gym bag, two deposit slips indicating a transfer of $50,000 from Gordon's savings account to his checking account. At trial, Agent Hilborn testified that there existed an independent source of information which justified an investigation at the Marine Midland Bank. *See United States v. Friedland,* 441 F.2d 855 (2d Cir. 1971), *cert. denied,* 404 U.S. 867, 92 S.Ct. 143, 30 L.Ed.2d 111 (1972); *United States v. Nardone,* 127 F.2d 521, 523 (2d Cir.), *cert. denied,* 316 U.S. 698, 62 S.Ct. 1296, 86 L.Ed. 1767 (1942). Judge Foley acted within his discretion in relying upon Hilborn's testimony and in finding the existence of an independent source of information.

Gordon's remaining contentions are without merit.

The judgment of conviction is affirmed.

OAKES, Circuit Judge (concurring):

I concur.

I do not believe that the so-called administrative exception cases, like *Donovan v. Dewey,* —— U.S. ——, 101 S.Ct. 2534, 69 L.Ed.2d 262 (1981), lead us to any clearcut answer in the case at bar, for they have turned on a weighing of the legislative interest involved in the regulatory scheme permitting inspection and the reasonable expectation of the commercial property owner as to the likelihood that periodic inspection will be conducted and the speci-

ficity of the purposes for which the inspection is made. Under certain circumstances, it seems, property may be subject to warrantless inspection when Congress has "reasonably" determined that such inspection is necessary to further a regulatory scheme and the "regulatory presence is sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes." *Donovan v. Dewey*, at ——, 101 S.Ct. at 2539. *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), in which the Court held warrantless OSHA inspections unconstitutional, was specifically distinguished in *Dewey*, at ——, 101 S.Ct. at 2539, on the basis that the Occupational Safety and Health Act "fail[ed]" to tailor the scope and frequency of such administrative inspections to the particular health and safety concerns posed by the numerous and varied businesses regulated by the statute." But our case does not involve a periodic inspection. Neither *Marshall* nor *Dewey*, therefore, furnishes us with a specific guideline.

What is important here, however, and what I think tips the scales in favor of the reasonableness of the seizure and subsequent search of Gordon's records was the emergency nature of the situation, an emergency in a sense comparable to that involved in such Fifth Amendment cases as *United States v. Caltex, Inc.*, 344 U.S. 149, 73 S.Ct. 200, 97 L.Ed. 157 (1952), or *Urciolo v. Washington*, 305 A.2d 252 (App.D.C. 1973). The Superintendent of Insurance had reason to seek the remedy of temporary receivership under New York law and to conduct the searches in question pursuant to his authority as a receiver. Gordon had left if not abandoned the premises of Lifelines and Spectrum Planning after directing an associate to shut down their operations, which the associate had done. There did indeed exist "a substantial likelihood that Gordon's insurance customers would suffer financial harm," by way of expiration of policies or otherwise, if remedial action were not quickly taken. Under such circumstances, the need for swift, unannounced inspection was demonstrable.

While I cannot agree that Gordon is challenging on appeal for the first time the evidence before Justice Conway of the New York Supreme Court, I do agree that in seeking an appointment as temporary receiver, the Superintendent of Insurance acted pursuant to established statutory authority, N.Y.Ins. Law §§ 24, 35, 526, 528 (McKinney), and with procedural regularity. The Superintendent's showing, pursuant to Section 6401 of the New York Civil Practice Law and Rules, that "property [would] be removed from the state, or lost, materially injured or destroyed," demonstrated exigent circumstances. His appointment as receiver entitled, indeed required, him to take possession of the records of the insurance business for which he was receiver, *id.*, and he became an officer of the court.

Accordingly, I agree that the conduct of the Superintendent of Insurance, was constitutionally permissible under the circumstances presented. As I see it, he was, when acting by virtue of his receivership powers, in effect acting as with a warrant issued upon a showing of probable cause.